Kathryn O. REINHOLD,
Plaintiff–Appellee,

v.

COMMONWEALTH OF VIRGINIA;
Virginia School For The Deaf And
Blind, Defendants–Appellants.

No. 96–2816.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1997.

Decided Feb. 6, 1998.

**ARGUED:** Guy Winston Horsley, Jr., Senior Assistant Attorney General, Office of the Attorney General, Richmond,VA, for Appellants. Harris Dewey Butler, III, Butler, Macon, Williams, Pantele & Lowndes, P.C., Richmond, VA, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General of Virginia, Catherine C. Hammond, Deputy Attorney General, Office of the Attorney General, Richmond, VA, for Appellants. Thomas L. Kemp, Kemp & Kemp, P.A., Elkton, MD, for Appellee.

Before MURNAGHAN, NIEMEYER, and HAMILTON, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN joined. Judge NIEMEYER wrote a separate opinion concurring in part and dissenting in part.

## OPINION

HAMILTON, Circuit Judge:

The Commonwealth of Virginia and the Virginia School for the Deaf and Blind (collectively, the Appellants) appeal the district court's denial of their renewed motion for judgment as a matter of law as to appellee Kathryn Reinhold's (Reinhold) claims of sexual harassment in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–2(a)(1). The Appellants argue that the district court erred when it denied their motion following a jury verdict in Reinhold's favor. The Appellants also argue that the district court erred when it submitted Reinhold's claim for psychological damages to the jury. We agree with Appellants that the district court erred when it denied their motion as to Reinhold's hostile work environment sexual harassment claim. However, we hold the district court properly denied the Appellants' motion as to Reinhold's *quid pro quo* sexual harassment claim and the district court properly submitted Reinhold's claim for psychological damages to the jury. Accordingly, we affirm the district court's judgment in part and reverse it in part.

## I.

■ The Appellants appeal the district court's denial of their renewed motion for judgment as a matter of law. Therefore, we consider the evidence presented at trial in the light most favorable to Reinhold, the nonmoving party. *See Price v. City of Charlotte,* 93 F.3d 1241, 1249 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).

Reinhold was employed as a school psychologist at the Virginia School for the Deaf and Blind (VSDB) in Hampton, Virginia, beginning on August 23, 1990. In her position as school psychologist, Reinhold was part of a work unit that consisted of a group of multidisciplinary professionals, referred to as the Treatment and Diagnostic Team (the Diagnostic Department or the Department), responsible for providing a variety of services to the students. As school psychologist, Reinhold counseled children, both individually and in groups, performed psychological testing, and worked with teachers on student behavioral problems. In addition, Reinhold was responsible for completing the psychological portions of triennial evaluations for each student.

In September 1990, Dennis Martin, the man whom Reinhold accuses of sexually harassing her, was appointed coordinator of the Diagnostic Department and was appointed to the Administrative Council of VSDB, a position reserved for top management at the time he was appointed. According to a letter sent to Reinhold confirming the terms of her employment, Martin, VSDB's audiologist, was her "immediate supervisor," responsible for assisting Reinhold "with any questions [she] may have concerning [her] schedule, performance and duties." (J.A. 428). Ruth Berman was the business manager of VSDB and the management-level supervisor, or "department head," of the Diagnostic Department. (J.A. 314). Berman reported to Frank Bryan, Superintendent of VSDB.

One of the issues pertinent to this appeal is the scope of Martin's supervisory authority over Reinhold. In his role as immediate supervisor of Reinhold and the other members of the Diagnostic Department, Martin was responsible for approving leave schedules, convening Department meetings to discuss work plans and projected assignments, and developing and managing the departmental budget. In addition, Martin evaluated staff members' job performances and conducted workshops for the staff. Although Martin was not responsible for final hiring decisions, he participated in interviewing and made hiring recommendations.[1] As with hir-

---

1. Martin did not participate in the hiring process when Reinhold was hired, but acknowledged that he probably would have served on her interview panel and participated in the hiring decision had

ing decisions, Martin did not have the final authority to approve attendance at professional conferences but did recommend that certain employees be permitted to attend conferences and signed the approval form as recommending supervisor.

With regard to discipline, Martin did not have the authority to issue formal discipline citations without approval from another school administrator. However, he did participate in informal discipline and was vested with the responsibility of ensuring that Department members performed their jobs. To that end, Department members signed in and out at Martin's office and were required to meet with and report to Martin on a regular basis about their assignments and their progress. Although Reinhold apparently believed that she generally had to do what Martin required of her, on at least one occasion when she disagreed with Martin, she discussed the issue with VSDB Superintendent Frank Bryan, who agreed with Reinhold and overruled Martin's decision at issue.

With respect to the evaluation of Reinhold's performance, in particular, Berman testified that she was the individual who recommended that the superintendent retain Reinhold for a second year as school psychologist following the 1990–91 school year. According to Berman, Martin did not have any formal participation in her decision to recommend Reinhold for a second year; however, Berman spoke regularly with Martin about Reinhold, and she considered Martin's evaluation of Reinhold's performance in deciding whether to recommend a second year for Reinhold.

During Reinhold's first school year at VSDB, the 1990–91 school year, she encountered no difficulties with Martin and considered him a friend. Members of the Department frequently had lunch together, and on occasion, Reinhold accompanied Martin to dinner to entertain a prospective employee or to discuss a case. On another occasion she went to a movie with Martin following a particularly difficult day. Reinhold testified that, at that time, Martin had not engaged in any inappropriate behavior toward her and she had no reason to fear him. On Rein-

hold's birthday, Martin gave her a desk plate bearing the inscription "Kathryn Reinhold, Psychologist" and a card including the statement, "I love you." Because both children and employees at VSDB frequently expressed their affection for one another by communicating, via sign language, "I love you," Reinhold believed that Martin's statement in the card was nothing more than an expression of support and friendship. In response, she wrote a thank you note which closed with the same expression.

Beginning in late July or early August 1991, just before the beginning of the 1991–92 school year, Reinhold began to experience unwelcome sexual advances by Martin. The first incident occurred when Martin came to Reinhold's office and recited a poem about the first time he masturbated. Reinhold testified that she felt embarrassed and very uncomfortable and that, in response, she made an excuse to leave her office. Some time later in August 1991, Martin called Reinhold into his office and gave her "pills" which contained sexually explicit messages.

Martin then began requiring Reinhold to come to his office to meet with him alone. He used these meetings as opportunities to sexually approach her by, for example, telling her that he could not control his feelings, that he felt like grabbing her all day, that he could not take his eyes off of her, and that he could not control himself. When Reinhold objected to Martin's sexually harassing behavior, he would stop the harassment temporarily but would later return to it. On at least three occasions, Martin tried to kiss Reinhold.

On one occasion during the fall of 1991 when Reinhold was out sick one day, allegedly because of the stress of her work and Martin's continual harassment of her, Martin called her at home. Reinhold refused to allow him to see her and agreed to speak with Martin only briefly. In response, when she returned to VSDB the next day, Martin issued her a "pink slip" for "insubordination" as her supervisor. According to the "pink slip," Martin was suspending Reinhold for two days and giving her twenty additional

he not been on vacation at the time that Reinhold was interviewed.

psychological evaluations to be due in two weeks. The pink slip stated further:"This is a written warning of intolerance to the displayed actions. Next time you're fired!!!! Well no, I can't do that. Anyway, I'll find some means for making your life hell!!!! By the way, I love you." (J.A. 438). In her testimony at trial, Reinhold acknowledged that there was "some element of jokingness" to the pink slip and apparently did not believe that she was actually suspended for two days or had to do twenty additional psychological evaluations. (J.A. 197). Nevertheless, Reinhold testified that she felt the pink slip was a definite threat because Martin had the power to assign her twenty additional psychological evaluations, given that he controlled how much work she had to perform. Reinhold testified that Martin typically reacted to her consistent rejection of his advances by telling her that he hated her and could make her life hell and then stating that he loved her.

Reinhold testified that following the "pink slip" incident, Martin "turned mean." (J.A. 198). According to Reinhold, during the first year of their friendship, Martin talked often about his growing up in a gang and about the fact that he was a black belt in karate, violent stories that allegedly made Reinhold nervous. Because her husband traveled a lot and Martin knew Reinhold was often home alone, Reinhold grew fearful of Martin. In late November 1991, Martin came into Reinhold's office and gave her a collection of erotic poetry that he had written for her, entitled "Rein's Hold—A Story of the Heart." (J.A. 442). The poetry included explicit sexual passages, such as "baptize me with your bodily fluids," "I want to suck you up within myself," and "I want to wrap you in my arms and feel your heart beat next to mine." (J.A. 445).

According to Reinhold, she repeatedly insisted that Martin stop his sexually harassing behavior toward her. On one occasion, after Thanksgiving 1991, Reinhold asked Martin to stop his inappropriate behavior toward her and told him that she could report him for sexual harassment. In response, Martin leaned back in his chair and said, "Who's going to believe you? I'm a great guy."

(J.A. 193). Reinhold then told Martin that she had kept copies of her poems that he had given her as evidence of his behavior toward her. According to Reinhold, Martin responded to this news by walking around to the side of his desk, putting his hands around her neck, and saying, "surely you threw those out." *Id.* Reinhold testified that she grew nervous and asked, "[A]re you sure about that," to which Martin responded that what he had done was not sexual harassment, "this[was]." (J.A. 194). Martin then tried to kiss Reinhold, but she left his office.

Also during late 1991, Reinhold alleges that Martin began assigning her extra work and inappropriate assignments that were outside her job description. For example, Martin assigned Reinhold the task of counseling, disciplining, and monitoring a colleague who was Martin's subordinate and was not performing her job to Martin's satisfaction. In spite of Reinhold's protestations that monitoring a colleague was inappropriate and was Martin's job as supervisor, Martin insisted that she take on the additional responsibility. Reinhold also alleges that she was told that she would have to train a teacher in diagnostic testing that it had taken Reinhold two years to learn. According to Reinhold, the teacher had no training in diagnostic testing, and to teach her would be unreasonably time-consuming, given Reinhold's regular duties as the only school psychologist at VSDB. Although Reinhold protested that she could not fulfill her regular duties and train the teacher in educational diagnostics, Martin again insisted that she take on the additional responsibility.

At some point during the fall of 1991, Reinhold told a co-worker, Kathy Verano, of Martin's behavior toward her. Together, Reinhold and Verano developed a system whereby Verano would interrupt meetings between Reinhold and Martin if they took more than five to ten minutes. Also, in November 1991, Reinhold reported Martin's behavior to Dr. Mary Huffnell, Reinhold's clinical supervisor for purposes of Reinhold's licensure as a school psychologist for the Virginia Board of Psychology. Dr. Huffnell told her that approximately ten years before, she had reported a teacher for abuse and

that school officials turned against her and made her life so difficult that she left, such that she was only a consultant to the school at the time she was working with Reinhold. Reinhold testified that both she and Dr. Huffnell assumed the same thing would happen to her. When asked to describe her physical and emotional state at the end of November 1991, Reinhold stated that she felt very depressed, that she was not sleeping well at night because she was fearful and her husband was traveling a lot, that she was losing a lot of weight, that she dreaded going into work, and that she felt very apathetic.

Several times during this period, Martin asked Reinhold to go away with him, to destinations such as Hawaii. Reinhold declined Martin's invitations, stating that she was happily married. In December 1991 or January 1992, Martin began talking about a cochlear ear implant seminar to be held in Charlottesville, Virginia. According to Reinhold, Martin stated that the seminar would be a good opportunity for them to go away together on a "nice little vacation." (J.A. 194–95). Because one of her students was considering getting a cochlear ear implant and part of the conference was on the psychological aspects of a cochlear ear implant, Reinhold was very interested in attending the conference. In response to Martin's suggestion, Reinhold told him that she would like to attend the conference and that she would be happy to go as long as other VSDB staff attended. Reinhold made it clear, however, that she would not go to the conference if she and Martin were to go alone. Subsequently, Reinhold learned that two other employees were to go with Martin to the conference. When she confronted Martin with why she was not going, Martin "got [a] smirk on his face" and said that she was not going because she said she did not want to go. (J.A. 196).

In February 1992, after Valentine's Day, Martin asked Reinhold to go with him on a pre-paid vacation to Paris and presented Reinhold with a trip itinerary. When Reinhold refused to go, Martin protested that he had spent his mortgage on the tickets. Reinhold responded that he should take his wife.

On March 9, 1992, Reinhold reported Martin's behavior to Berman and to VSDB's human resources representative, Joan Gentry. According to Reinhold, she did not complain about Martin's behavior earlier because Martin and Superintendent Bryan were good friends and she was afraid that she would not be believed and that nothing would be done about the harassment. In addition, Reinhold testified that she was scared that Martin might physically harm her.

In response to Reinhold's complaint, VSDB initiated an investigation and temporarily suspended Martin with pay. Following her interview with Berman and Gentry, Reinhold immediately left work and went on leave until March 18, 1992. Between March 9 and March 20, VSDB investigated Reinhold's complaints against Martin. During the investigation, school officials interviewed each member of the Diagnostic Department and two other school employees. Investigators, however, asked only four questions of each interviewee, and while the questions concerned inappropriate behavior, in general, none of the questions mentioned inappropriate sexual conduct, specifically, or inappropriate supervisory behavior. Rather, the questions asked generally whether the staff member was having any problems with inappropriate behavior or negative comments and whether the person felt that she had been working in a hostile work environment, defined as an environment that causes you to feel uncomfortable or stressed. Because of confidentiality concerns, none of the questions asked about Dennis Martin or Kathryn Reinhold, in particular.

One of the interviewees who did discuss Martin's behavior toward Reinhold, Kathleen Verano, told investigators that she was concerned that Martin was obsessed with Reinhold and that he used his position over Reinhold to manipulate her. In addition, Verano told investigators that while she did not believe that she personally had been sexually harassed, she believed that Martin had "problems with boundary issues" in that he made inappropriate comments and inappropriately touched other employees. (J.A. 500). Specifically, Verano mentioned that Martin had left a message on her answering

service, stating that "[i]n case you can't recognize this sexy voice, this is the person who has been appointed as your supervisor." *Id.* On another occasion, he was wearing gloves to clean hearing aids and referred to it as a "gynecological exam." *Id.*

During the time of the investigation, Adrienne Brooks, an employee who was not interviewed by school officials, came to Gentry and reported that Martin had made sexual advances toward her. Because she did not wish to make a formal complaint and because she had no written evidence to substantiate her claims, the school did not interview Ms. Brooks formally or take any action in response to her allegations.

On March 13, 1992, the school held a hearing to permit Martin to respond to the allegations made by Reinhold. On March 20, the school issued a report, recommending that Martin be relieved of his assignment as Coordinator of the Diagnostic Department and referred for counseling.

On March 24, 1992, Martin was charged with a Group II offense under VSDB's disciplinary policy. The charge stated that Martin had coerced and threatened his subordinate by sending a note entitled a pink slip; that Martin had created an intimidating and hostile environment by sending other sexually explicit notes; and that these behaviors were in violation of VSDB's sexual harassment policy. Under VSDB's disciplinary policy, the most serious type of violation is a Group III violation, punishable by termination. Group III offenses include threatening or coercing persons associated with any state agency. Although Superintendent Bryan testified that Martin could have been given at least two Group II violations and possibly a Group III violation, Martin was given only one Group II violation because of his previously "outstanding work performance and dedication to his job." (J.A. 454). In addition to receiving the Group II charge, Martin was stripped of all supervisory responsibility, which entailed a loss of status and approximately $200 per week salary. Bryan also instructed Martin to avoid being alone with Reinhold and to refrain from talking with other employees about her allegations against him. Finally, Martin was required to receive counseling.

Following her complaint against Martin, Reinhold's office was moved from Martin's building to another building, where she had an office that was too small for her furniture and inadequate for purposes of conducting the educational diagnostic tests with the students that she was assigned to conduct. Reinhold also alleges that the building to which she was moved was particularly subject to racial tension. According to VSDB, Reinhold's office was moved to minimize any contact between Martin and her and because it was impractical to move Martin's office due to his audiological equipment.

Between her March 9 report of Martin's harassment and her resignation on April 16, Reinhold was not contacted by Martin either at school or at home. According to Reinhold, however, she was subjected to numerous incidents of harassment as a result of her allegations against Martin. For example, on the day she returned to work to her new office in the new building, she was greeted by a big banner, covering the length of another teacher's door and just around the corner from her office, that said, "Welcome back, Dennis. We love you." (J.A. 228–29). The sign had been signed by many signatures. At the time she saw the poster, numerous teachers were staring at her and, according to Reinhold, it was clear that the poster was for her benefit, since Martin's office was in an entirely different building.

Because Reinhold is white and Martin is black, many of the incidents that occurred after Reinhold returned to VSDB involved racially derogatory statements made by other staff members, such as staff members' calling her "white bitch." (J.A. 228). According to Reinhold, she had been told that Martin was telling people his relationship with Reinhold had been consensual and that Reinhold was a sick woman and a racist. A former student at VSDB, Latisha Bazemore, testified she observed the poster and she observed teachers treating Reinhold differently after she made complaints about Martin.

Reinhold testified she complained to both Berman and Gentry several times about the

offensive comments people were making, the ostracism she was experiencing, and the stares she was receiving. Although Reinhold complained about these incidents and about the various teachers who were making comments to her, no disciplinary action was apparently taken in response.

On March 27, 1992, Martin sent a memorandum to members of the Diagnostic Department concerning "a recent incident that allegedly occurred" and the ending of his tenure as Coordinator of the Department. (J.A. 484). Superintendent Bryan approved Martin's sending of the memo, and Reinhold felt that the memo was a continuation of Bryan's excusing Martin's actions, trying to lessen the impact of the discipline, giving preference to Martin, and treating him like he was the victim. Stating that the March 27 memo was the "last straw," Reinhold gave notice of her resignation on March 30, 1992. (J.A. 233). She then took two weeks of sick leave, and on April 16, 1992, tendered her written resignation confirming the March 30 discussions.

With regard to the emotional distress suffered by Reinhold during the sexual harassment and alleged subsequent retaliation, Reinhold's treating clinical psychologist, Michelle Sullivan, testified at trial that she diagnosed Reinhold as suffering from post-traumatic stress disorder (PTSD) and depression. Sullivan testified that a diagnosis of PTSD means that a person's social, occupational, or functional life are impaired by the condition and that, having been confronted with events that threatened death or serious psychological or physical injury, the person's response to those experiences include fear, helplessness, and even horror. In Reinhold's case, Sullivan testified the cause of her PTSD was both the harassment by Martin and VSDB's failure to respond to that harassment after Reinhold attempted to seek redress. As a result of all of these events, Reinhold testified at trial that she still suffered emotionally from her experiences at VSDB.

With regard to the sexual harassment policy at VSDB, no formal training was provided to employees on sexual harassment prior to January 27, 1992. Following both Reinhold's complaint and her subsequent notice of resignation given on March 30, 1992, Superintendent Bryan circulated a memo on April 6, 1992, stating that sexual harassment was a serious offense and was prohibited. In the letter, Bryan also quoted a portion of the Commonwealth of Virginia Employee Handbook prohibiting sexual harassment. The memo stated further that if anyone needed clarification or had questions about the policy, that person should contact Gentry.

On January 31, 1996, Reinhold filed this suit against the Appellants in the United States District Court for the Eastern District of Virginia, alleging that Martin had sexually harassed her and that she had been retaliated against for complaining about that harassment, both in violation of Title VII of the 1964 Civil Rights Act. See 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a). On October 28 and 29, 1996, the case was tried before a jury. The Appellants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) following the close of Reinhold's evidence and following the close of all of the evidence. Both motions were denied, and the case was submitted to the jury. The jury returned a verdict in favor of Reinhold on both counts of sexual harassment—hostile work environment sexual harassment and *quid pro quo* sexual harassment—and awarded her $85,000 in compensatory damages. The jury found against Reinhold on her retaliation claim.

On October 31, 1996, the district court entered judgment in favor of Reinhold on her sexual harassment claims and in favor of the Appellants on her retaliation claim. On November 7, 1996, the Appellants renewed their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). On December 13, 1996, the district court denied the Appellants' motion. The Appellants noted a timely appeal.

II.

The Appellants first appeal the district court's denial of their renewed motion for judgment as a matter of law as to Reinhold's hostile work environment and *quid pro quo* claims of sexual harassment in violation of Title VII. See *Hartsell v. Duplex Prods.,*

*Inc.,* 123 F.3d 766, 771 n. 3 (4th Cir.1997) (two forms of workplace sexual harassment are legally cognizable under Title VII: hostile work environment sexual harassment and *quid pro quo* sexual harassment). After setting forth the appropriate standard of review, we will consider the district court's rulings as to each of these claims in turn.

### A.

 Judgment as a matter of law under Federal Rule of Civil Procedure 50 is proper " 'when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.' " *Singer v. Dungan,* 45 F.3d 823, 826 (4th Cir.1995) (quoting 5A James W. Moore, Moore's Federal Practice ¶ 50.07[2], at 50–76 (2d ed.1994)). We review *de novo* the district court's denial of judgment as a matter of law. *See Benesh v. Amphenol Corp. (In re Wildewood Litigation),* 52 F.3d 499, 502 (4th Cir.1995). In reviewing the district court's decision, we consider the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party to determine whether the evidence presented at trial was sufficient to allow a reasonable jury to render a verdict in her favor. *See Price,* 93 F.3d at 1249–50; *Andrade v. Mayfair Management, Inc.,* 88 F.3d 258, 261 (4th Cir.1996)."While we are compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, we are not a rubber stamp convened merely to endorse the conclusions of the jury, but rather have a duty to reverse the jury verdicts if the evidence cannot support it[sic]." *Price,* 93 F.3d at 1250 (citations omitted).

### B.

 The Appellants first argue that the district court erred when it denied their Rule 50(b) renewed motion for judgment as a matter of law as to Reinhold's hostile work environment claim of sexual harassment in violation of Title VII. We agree.

 Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] ... terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). This provision prohibits sexual harassment that is so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive working environment. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986); *Andrade,* 88 F.3d at 261. To establish a sexual harassment claim based on a hostile work environment, the plaintiff employee must show: (1) the conduct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *See Spicer v. Virginia,* 66 F.3d 705, 710 (4th Cir.1995) (*en banc* ).

In this case, the Appellants admit that Reinhold was subjected to a hostile work environment by Martin and, thus, that the first three requirements of proving a hostile work environment claim under Title VII are met. The Appellants argue, however, that there is no factual basis on which to hold them liable for Martin's behavior.

 With respect to the fourth prong of the analysis, which requires some basis on which to hold the employer liable for the sexually harassing behavior of one of its employees, we have previously held that "an employer is liable for a sexually hostile work environment created by a supervisor or other employee *only if the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action.*" *Andrade,* 88 F.3d at 261 (emphasis added). Knowledge of the sexually harassing behavior"may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with Title VII, would be aware of the conduct." *Spicer,* 66 F.3d at 710. However, "where an employer implements timely and adequate corrective measures after harassing conduct has come to its attention," the employer may not be held liable for the hostile work environment. *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995).

We note that Title VII does not require that the employer impose the most severe sanction available in order to avoid liability under Title VII for the sexually harassing behavior of one of its employees. *See Waymire v. Harris County,* 86 F.3d 424, 429 (5th Cir.1996); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 536 (7th Cir.1993). Rather, as long as the employer investigates an employee's charge of sexual harassment and presents "a reasonable basis for its subsequent actions," its response is adequate to avoid liability for its employee's conduct under Title VII. *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987); *see also Saxton,* 10 F.3d at 536 ("Title VII requires only that the employer take steps reasonably likely to stop the harassment."). In addition, as we stated in *Spicer,* "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Spicer,* 66 F.3d at 711; *see also Wathen v. General Elec. Co.,* 115 F.3d 400, 407 (6th Cir.1997) (holding no employer liability for employee's sexual harassment, reasoning, in part, that the employer's response "put an end to the behavior of which [the plaintiff] complained"); *Waymire,* 86 F.3d at 429 (holding that employer's response to sexual harassment complaint was sufficient to preclude employer liability where harassment stopped following remedial action); *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 578 (10th Cir.1990) (affirming finding of no employer liability for sexual harassment where there were no more reported incidents of sexually harassing behavior following employer's remedial action); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989) (holding that employer could not be held liable for sexual harassment and finding it of "special importance" that the "harassment ended after the remedial action").

In this case, Reinhold does not dispute that the first time VSDB became aware of Martin's misconduct toward her was on March 9, 1992, when she first reported the harassment to Gentry and Berman. She also does not dispute that Martin was immediately suspended with pay, that an investigation into Reinhold's allegations was launched, and that she was given leave time to help her recover from the harassment. Reinhold argues, however, that these measures and the discipline of Martin that followed were inadequate to address Martin's misconduct. In particular, Reinhold alleges that VSDB's investigation was a sham, noting that VSDB asked no questions directly about sexual harassment, interviewed only members of the Diagnostic Department and two other individuals, and failed to take seriously other women's allegations of improper behavior by Martin. Reinhold also alleges that while Martin was disciplined, he continued to instigate problems for Reinhold by calling her a liar, a racist, and a sick woman to other staff members, and by encouraging her ostracism. Finally, Reinhold alleges that when she complained about this subsequent harassment, no measures were taken to discipline either Martin or her fellow teachers who were calling her names and ostracizing her at Martin's instigation. Thus, according to Reinhold, VSDB's corrective measures did not stop the hostile work environment she experienced because of Martin and, therefore, were inadequate.

The flaw in Reinhold's argument is that following March 9, 1992, the day she reported the sexual harassment to VSDB management, she was never sexually harassed by Martin again. It is undisputed that after Reinhold complained, Martin never contacted her either at home or at school. All of the behavior that allegedly occurred after Reinhold complained was apparently directed at her by fellow teachers and possibly administrators in retaliation for her complaints about Martin. While Reinhold may have continued to experience a hostile work environment, that hostile environment was not caused by sexual harassment, but rather, by animosity directed at Reinhold for complaining about Martin's sexual harassment of her. This subsequent behavior may be evidence in support of her retaliation claim, *see* 42 U.S.C. § 2000e–3(a) (prohibiting discrimination against any individual because she has opposed any practice made an unlawful employment practice or because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing"), but it is not evidence which may

support a sexual harassment claim. We note that the jury found against Reinhold on her retaliation claim, and Reinhold does not appeal that judgment.

Following Reinhold's complaint, VSDB immediately took remedial measures to prevent Martin from continuing to harass Reinhold, and Reinhold was never again sexually harassed. Because VSDB's corrective measures were taken promptly and effectively ended the sexual harassment, VSDB cannot be held liable under Title VII as an employer for the hostile work environment created by Martin. *See Spicer*, 66 F.3d at 711 ("when an employer's remedial response results in the cessation of the complained of [sic] conduct, liability must cease as well").

■ Reinhold also complains that by transferring her office to another building that was fraught with racial tension and where her new office was too small to contain her furniture, rather than transferring Martin, VSDB's corrective measures were not adequate because they punished her for Martin's inappropriate behavior. Reinhold is correct that a remedial action is "an inadequate discharge of the employer's duty of correction" where the action "reduces the victim's wage or other remuneration, increases the disamenities of work, or impairs her prospects for promotion." *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990). However, in this case, it is undisputed that nothing about Reinhold's compensation or benefits changed as a result of her office being moved to another building. Although the office to which she was moved was significantly smaller than her previous office and was not large enough to contain all of her furniture, VSDB explained that it considered moving Martin's office but determined that such a move was not feasible because of the expense of moving the specialized equipment Martin used in his position as audiologist. Thus, while the move may have been inconvenient for Reinhold, VSDB adequately explained why it chose to move Reinhold's office, rather than Martin's, and other than the inconvenience, there is no evidence that the move detrimentally affected the terms and conditions of Reinhold's employment. In addition, when considered in light of all of the

other components to VSDB's corrective action intended to punish Martin and to ensure that the sexual harassment ended, it cannot seriously be argued that VSDB's response in some way punished Reinhold, rather than Martin.

In sum, while it is undisputed that Martin created a hostile work environment that was in violation of Title VII, the Appellants cannot be held liable for his actions because as soon as VSDB was informed of Martin's inappropriate behavior, it took adequate remedial action and no further sexual harassment occurred. Because Reinhold failed to allege facts sufficient to impute liability for Martin's actions to VSDB, the district court erred when it denied the Appellants' renewed motion for judgment as a matter of law as to Reinhold's claim of hostile work environment sexual harassment.

### C.

■ In addition to arguing that the district court erred when it denied their renewed motion for judgment as a matter of law as to Reinhold's hostile work environment sexual harassment claim, the Appellants argue that the district court erred when it denied their renewed motion for judgment as a matter of law as to Reinhold's *quid pro quo* sexual harassment claim. *Quid pro quo* sexual harassment occurs when an employer conditions, explicitly or implicitly, the receipt of a job benefit or a tangible job detriment on the employee's acceptance or rejection of sexual advances. *See Spencer v. General Elec. Co.*, 894 F.2d 651, 658 (4th Cir.1990). In order to establish a *prima facie* case of *quid pro quo* sexual harassment, a plaintiff must show: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. *See id.* at 658. The fifth requirement—that the employer knew or should have known of the harassment and took no effective remedial

action—is automatically satisfied where the sexual harassment is committed by one of the employer's supervisors. *See id.; Katz v. Dole,* 709 F.2d 251, 255 n. 6 (4th Cir.1983); *see also Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir.1997) (employer is subject to strict liability where "submission to a supervisor's sexual demands is made a condition of tangible employment benefits"); *Davis v. City of Sioux City,* 115 F.3d 1365, 1367 (8th Cir.1997) ("In the situation of quid pro quo sexual harassment by a supervisor, where the harassment results in a tangible job detriment to the subordinate employee, liability is imputed to the employer."); *Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1552 (11th Cir.1997) (when a supervisor conditions job benefits on sexual favors, the supervisor, by definition, acts as the company); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.1994) ("Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for *quid pro quo* harassment.").

■ Once the plaintiff establishes a *prima facie* case of *quid pro quo* sexual harassment, the burden of production shifts to the defendant to rebut the presumption of sexual harassment with legitimate, nondiscriminatory reasons for the employment decision in question. *See Spencer,* 894 F.2d at 659. If the defendant succeeds in rebutting the presumption, the burden of production returns to the plaintiff to show that the defendant's nondiscriminatory explanation is pretextual and that the employment decision was based on sex discrimination. *See id.*

In this case, the Appellants concede that Reinhold has proven the first three requirements of the *prima facie* case of *quid pro quo* sexual harassment. The Appellants argue, however, that Reinhold's *quid pro quo* claim fails because: (1) Reinhold has not shown that she suffered any tangible job detriment as a result of rejecting Martin's sexual advances, the fourth prong of the *prima facie* case; and (2) Martin was not a "supervisor" for purposes of Title VII, such that VSDB may be held liable for his actions

in conditioning a job benefit on sexual favors, the fifth prong of the *prima facie* case.

1.

■ In reviewing the district court's decision to deny the Appellants' renewed motion for judgment as a matter of law as to Reinhold's claim of *quid pro quo* sexual harassment, then, the first issue we must address is whether Reinhold has shown that she experienced a "tangible job detriment" as a result of her rejection of Martin's advances. In order to satisfy this, the fourth, prong of the *prima facie case* requirement, Reinhold must show that "[t]he acceptance or rejection of the harassment [was] an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment...." *Spencer,* 894 F.2d at 658; *see also Karibian,* 14 F.3d at 778 ("It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job."); *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir.1990) ("*Quid pro quo* harassment obtains 'when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, *or* punishes that subordinate for refusing to comply.'") (citation omitted). Under the EEOC Guidelines, it is sufficient if the plaintiff shows that "submission to or rejection of [sexually harassing] conduct ... [was] used as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a)(2) (1996); *see also Meritor Sav. Bank,* 477 U.S. at 65, 106 S.Ct. at 2404–05 (EEOC interpretive guidelines are not binding authority but may be considered as guidance).

■ The issue in this case is whether Reinhold suffered any loss of a job benefit or experienced a tangible job detriment as a result of her rejection of Martin's advances. Reinhold alleges that several adverse consequences occurred as a result of her rejection of Martin's advances: (1) she was denied the opportunity to attend a professional conference on cochlear ear implants and their psychological consequences because she refused to go alone with Martin to the conference;

(2) she was required to monitor and discipline a co-worker, who was also Martin's subordinate, despite having no authority over the co-worker; (3) she was required to train another teacher in complex educational diagnostic testing that it had taken Reinhold two years to learn, a task that was unreasonably time-consuming in light of her other responsibilities; (4) Martin threatened her with the responsibility of twenty additional psychological evaluations and two days' suspension because she did not permit him to talk with her or see her when she was home sick one day; and (5) Martin generally gave her more assignments and undesirable assignments following her rejection of his sexual advances. In response to these allegations, the Appellants argue that these consequences do not constitute "tangible job detriments" and that, to the extent that they are tangible job detriments, they are *de minimis* and should not be the basis for Title VII liability.

Under the broad definition contained in *Spencer* and the EEOC Guidelines, we are convinced that Reinhold has shown that she was denied a "job benefit" and that Martin used Reinhold's rejection of his advances as the "basis for employment decisions" affecting Reinhold. *See Spencer*, 894 F.2d at 658; 29 C.F.R. § 1604.11(a)(2). While none of Reinhold's allegations rise to the level of an"ultimate employment decision," *see Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981) (*en*

*banc* ) (Title VII disparate impact case), neither can they be equated with a "mere utterance" of an offensive epithet or other isolated occurrence that is too trivial to give rise to a cause of action under Title VII, *see Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 187 (6th Cir.1992) (recognizing *de minimis* job detriment where employee was transferred for only one day to undesirable position). To the contrary, Reinhold alleges that Martin used his authority as her supervisor to give her extra and inappropriate work assignments.[2] In addition, Reinhold's evidence suggests that Martin denied her the opportunity to attend a professional conference that would have enabled Reinhold to counsel more effectively a student who was considering undergoing a cochlear ear implant because she refused to go to the conference alone with him. *Cf. Henson v. City of Dundee*, 682 F.2d 897, 911 (11th Cir.1982) (holding that a supervisor's denial to a police dispatcher of the opportunity to attend the local police academy because of the dispatcher's rejection of the supervisor's sexual advances was sufficient to constitute *quid pro quo* sexual harassment).

In general, Reinhold's evidence suggests that Martin attempted to "mak[e][her] life hell" as he had promised if she rejected his advances, (J.A. 438), and did so by altering the conditions and privileges of her employment in tangible and detrimental ways.[3] In

---

**2.** Although Judge Niemeyer correctly notes that Reinhold's evidence suggests that she was denied the opportunity to attend a professional conference and assigned additional psychological evaluations, Judge Niemeyer ignores the evidence of other tangible job detriments that resulted from her rejection of Martin's advances. As set forth in more detail above, *see ante* at 933, Reinhold's evidence suggests that in addition to being denied the opportunity to attend the cochlear ear conference and being assigned additional psychological evaluations, she was assigned other additional tasks that had not previously been part of her job responsibilities. For example, Reinhold alleges that Martin assigned her the time-consuming task of training another teacher in complex educational diagnostic testing that it had taken Reinhold two years to learn, and she was asked to monitor and discipline a colleague over whom she had no supervisory authority. Thus, Reinhold alleges that her working conditions were altered in tangible and detrimental ways because of her rejection of Martin's advances. While we might agree that

some alterations in working conditions would be so *de minimis* as to make the imposition of employer liability inappropriate, we respectfully disagree with Judge Niemeyer that the evidence in this case, viewed in its totality, presents such a scenario.

**3.** We also note that while we have not decided whether threats of adverse consequences are sufficient to constitute a"tangible job detriment" actionable under a *quid pro quo* theory of sexual harassment, Martin specifically threatened Reinhold that if she did not pay him the attention he requested, he would make her life hell by, for example, assigning her additional work or having her suspended for two days. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir. 1997) (holding that threats of reprisal for the rejection of a supervisor's sexual advances constitute *quid pro quo* sexual harassment, even if the supervisor does not follow through on the threats, because"a quid pro quo violation occurs at the time when an employee is told that his or her compensation, etc. is dependent upon sub-

light of the evidence that Martin imposed greater work assignments and withheld at least one significant job benefit from Reinhold following her rejection of his sexual advances, we believe that a reasonable jury could conclude that Reinhold suffered a "tangible job detriment" sufficient to satisfy the fourth prong of the *prima facie* case requirement.

### 2.

The Appellants next argue that Reinhold has not shown that Martin was a "supervisor" for purposes of Title VII, permitting the court to impute liability for his actions to the Appellants, and, therefore, Reinhold has not satisfied the fifth element of the *prima facie* case. Although the Appellants acknowledge that VSDB considered Martin to be Reinhold's supervisor for certain school purposes, they argue that because Martin did not have the ultimate authority to hire, fire, or impose formal disciplinary sanctions against Reinhold, his authority did not rise to the level of authority sufficient to impute his actions to the employer under Title VII. We disagree.

In *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990), this court discussed the requirements for imputing the actions of a supervisor to an employer under Title VII and held that an individual is a supervisor "if he or she serves in a supervisory position and exercises *significant control over* the plaintiff's hiring, firing or conditions of employment." [4] *Id.* at 104 (emphasis added). We stated further that "[t]he supervisory employee need not have ultimate authority to hire or fire to qualify as an employer, as long as he or she has significant input into such personnel decisions." *Id.; accord Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993); *Kauffman,* 970 F.2d at 186. Finally, in *Paroline,* we stated that "[t]he power to determine work assignments often represents a key element of supervisory authority." *Paroline,* 879 F.2d at 104.

■ Applying this standard to the facts of this case, we believe that a reasonable jury could conclude that Martin exercised suffi-

mission to unwelcome sexual advances"); *Jansen v. Packaging Corp. of Am.,* 123 F.3d 490, 495 (7th Cir.1997) ("liability for quid pro quo harassment is strict even if the supervisor's threat does not result in a company act"); *but see Gary v. Long,* 59 F.3d 1391, 1396 (D.C.Cir.) (holding that plaintiff had not stated a claim for *quid pro quo* sexual harassment, where threats of adverse job consequences by supervisor were never carried out), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995).

4. The precise issue in *Paroline* was whether the plaintiff had produced sufficient evidence to create a genuine issue of material fact as to whether the individual supervisor who allegedly sexually harassed the plaintiff constituted an "employer" and was, therefore, an appropriate defendant under Title VII. *See Paroline,* 879 F.2d at 104. In resolving this issue, we stated that "[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Id.* This holding—that a supervisor can constitute an "employer" and, therefore, may be sued in his or her individual capacity under Title VII—has been subject to criticism and the source of much confusion. *See, e.g., Lenhardt v. Basic Inst. of Tech., Inc.,* 55 F.3d 377, 380–81 (8th Cir.1995) (rejecting individual liability under Title VII and, while recognizing *Paroline,* stating that "[w]hatever the law ... may have been at one time, the more

recent cases reflect a clear consensus ...: supervisors and other employees cannot be held liable under Title VII in their individual capacities"); *Griswold v. Fresenius USA, Inc.,* 964 F.Supp. 1166, 1168 (N.D.Ohio 1997) (recognizing that under *Paroline,* an agent of a corporate employer is directly liable under Title VII but stating that "the continuing viability of that holding has been called into doubt"); *Bryant v. Locklear,* 947 F.Supp. 915, 917 (E.D.N.C.1996) (lamenting that Fourth Circuit precedent, including *Paroline,* has "caused confusion" among district courts); *Frizzell v. Southwest Motor Freight, Inc.,* 906 F.Supp. 441, 448 (E.D.Tenn.1995) (acknowledging individual liability rule as set forth in *Paroline* but stating that more recent decisions "undermine whatever persuasive authority[*Paroline*] may have had"). In addition, in a more recent case, *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507 (4th Cir.1994), we held that an individual supervisor could not be held liable under the Age Discrimination in Employment Act (ADEA), *see* 29 U.S.C. § 621 *et seq.,* though we limited our holding to "personnel decisions of a plainly delegable character." *Id.* at 510–11, 510 n. 1. Regardless of whether we would continue to adhere to *Paroline*'s holding that an individual supervisor is subject to liability under Title VII, however, our discussion in *Paroline* concerning what constitutes supervisory authority under Title VII—the issue that concerns us today—has not been undermined by subsequent case law and remains good law.

cient supervisory authority over Reinhold to be considered her "supervisor" for purposes of employer liability under Title VII. First, VSDB designated Martin as Reinhold's supervisor from the beginning of her employment and referred Reinhold to him if she had "any questions ... concerning [her] schedule, performance and duties." (J.A. 428). Second, although Martin was on vacation when Reinhold was interviewed and hired, he routinely participated in interviewing and hiring staff members, and he evaluated staff members' job performances. Third, Martin was vested with the authority to informally discipline his subordinates, and he was generally responsible for ensuring that Diagnostic Department staff performed their duties adequately. Finally, all members of the Diagnostic Department, including Reinhold, were required to sign in and out of Martin's office and to meet with him regularly about their assignments and their progress. Thus, Martin had the authority to alter work assignments and shift responsibilities as needed.

▮▮ While the ultimate authority to hire, fire, and formally discipline Reinhold and the other members of the Department may not have rested with Martin, he had significant input into each of these decisions, and managed the day-to-day activities of Diagnostic Department employees. Diagnostic Department employees were informed that Martin was responsible for their work assignments and evaluations, and he signed disciplinary actions. When considered in the aggregate, a reasonable jury could infer from this evidence, at the least, that Martin had "significant input into ... personnel decisions" and the power to determine work assignments. *See Paroline,* 879 F.2d at 104. Therefore, under our circuit precedent, a reasonable jury could conclude that Martin was Rein-

hold's "supervisor" for purposes of Title VII liability.[5]

**3.**

Because Reinhold has produced sufficient evidence from which a reasonable jury could conclude that her working conditions were adversely affected as a consequence of her rejection of Martin's advances and that Martin had sufficient supervisory authority to be considered a "supervisor" for purposes of imputing liability to his employer, she has satisfied each of the five requirements of a *prima facie* case of *quid pro quo* sexual harassment. VSDB has offered no legitimate, nondiscriminatory reasons for any of the adverse consequences alleged by Reinhold and, therefore, her establishment of a *prima facie* case alone supports an inference of *quid pro quo* sexual harassment sufficient to support the jury's verdict in her favor. *See Spencer,* 894 F.2d at 659. Accordingly, the district court did not err when it denied the Appellants' renewed motion for judgment as a matter of law as to Reinhold's claim of *quid pro quo* sexual harassment in violation of Title VII.

**III.**

In addition to appealing the district court's denial of their renewed motion for judgment as a matter of law as to Reinhold's sexual harassment claims, the Appellants also appeal the district court's decision to submit Reinhold's claim for compensatory damages for psychological injury to the jury. Specifically, the Appellants argue that because compensatory damages for personal injuries sustained as a result of a Title VII violation were not available prior to November 21, 1991, the effective date of the 1991 amendments to the Civil Rights Act of 1964 (the 1991 Amendments), any injuries sustained by

**5.** As correctly noted by Judge Niemeyer in his opinion dissenting from this section, the rationale for imposing strict liability on the employer where a supervisor engages in the *quid pro quo* sexual harassment of a subordinate is that the supervisor, by definition, wields the employer's authority to alter the terms and conditions of the victim's employment. *See Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.1994). However, to the extent that Judge Neimeyer suggests that it follows from this rationale that an employer is only liable for a supervisor's harassment of a subordinate where the supervisor wields *ultimate* employment authority, we respectfully disagree. *Just as an employer has the authority to affect many detrimental changes in its employees' working conditions short of firing or demoting the employee, so may a supervisor wield the authority granted to him by his employer to affect tangible and detrimental changes in his subordinate's conditions of employment short of firing or demoting the subordinate.*

Reinhold as a result of harassment occurring prior to November 21, 1991 are not compensable. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 281–83, 114 S.Ct. 1483, 1506, 128 L.Ed.2d 229 (1994) (holding that the 1991 Amendments do not apply retroactively to cases pending on appeal at the time the amendments became effective and recognizing that the provision permitting compensatory damages would operate retrospectively if it were applied to conduct occurring before November 21, 1991, the effective date of the amendments). Reinhold argues, in response, that many of Martin's acts of harassment occurred after November 21, 1991 and, therefore, the district court properly instructed the jury that they could award compensatory damages for psychological injuries suffered as a result of these acts.

 Federal Rule of Civil Procedure 51 provides, in pertinent part, that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. Although we have previously stated that the failure to object to a jury instruction may be disregarded if a party has previously objected to the instruction and it is plain that a further objection would be unavailing, *see City of Richmond v. Madison Management Group, Inc.*, 918 F.2d 438, 453 (4th Cir.1990) (emphasizing that Rule 51 must be read in conjunction with Federal Rule of Civil Procedure 46, which provides that formal exceptions to rulings or orders of the court are unnecessary under certain circumstances), in this case, it does not appear that the Appellants ever objected to the district court's instructions to the jury with respect to the available damages. Nor did the Appellants request a limiting instruction to the effect that compensatory damages could only be awarded for injuries sustained as a result of conduct that occurred after the effective date of the 1991 Amendments, November 21, 1991. Because the Appellants failed to object to the district court's instructions to the jury on the issue of the availability of compensatory damages for Reinhold's alleged psychological injury, they cannot object to the alleged misinstruction on appeal.[6]

## IV.

Because no reasonable jury, considering the evidence in the light most favorable to Reinhold, could conclude that the Appellants failed to take adequate corrective measures when informed of Martin's creation of a sexually hostile work environment, we hold that the district court erred when it denied the Appellants' renewed motion for judgment as a matter of law as to Reinhold's hostile work environment sexual harassment claim in violation of Title VII. The district court did not err, however, in denying the Appellants' renewed motion for judgment as a matter of law as to Reinhold's claim of *quid pro quo* sexual harassment. Accordingly, we reverse the judgment in favor of Reinhold as to her claim of hostile work environment sexual harassment in violation of Title VII. We affirm the remainder of the judgment.[7]

*AFFIRMED IN PART AND REVERSED IN PART.*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I., II.A., II.B., and III., and I dissent from part II.C.

---

6. We note that both parties agree that under the 1991 Amendments, compensatory damages are available only for injuries sustained as a result of conduct occurring after the November 21, 1991 effective date. Therefore, there is no dispute as to the legal requirements for the imposition of compensatory damages. The only dispute is whether the district court properly submitted the issue of whether Reinhold suffered psychological injury as a result of conduct occurring after November 21, 1991 to the jury.

7. The verdict form completed by the jury permitted them to award compensatory damages if they found in favor of Reinhold on "the *quid pro quo* sexual harassment claim, the hostile work environment claim, or the retaliation claim." (J.A. 402). Because these instructions permitted the jury to award compensatory damages, as long as they found at least one violation of Title VII, our reversal of their finding on the hostile work environment sexual harassment claim does not necessitate remand for reconsideration of the amount of compensatory damages to which Reinhold is entitled.

Kathryn Reinhold complains, in part, that because she refused the amorous approaches of Dennis Martin, her immediate supervisor, Martin refused to approve her attendance at a professional conference and assigned her extra work duties. Martin, however, was only a work coordinator and did not have the employer's authority to hire, fire, promote, demote, or alter any of the terms and conditions of Reinhold's employment. When persons with that authority at the Virginia School for the Deaf and Blind (VSDB) learned of Martin's conduct, they conducted an investigation, following which they disciplined Martin.

Based on this evidence, the jury found, in relevant part, that VSDB violated Title VII through the *quid pro quo* sexual harassment created by Martin's advances. Because I believe that under our precedent the evidence was, as a matter of law, insufficient to establish a *quid pro quo* violation, I respectfully dissent.

To establish a *quid pro quo* violation of Title VII, a plaintiff must prove that she was subjected to unwelcome sexual conduct and that her reaction to the conduct was used as a basis for decisions affecting "tangible aspects of [her] compensation, terms, conditions, or privileges of employment." *Spencer v. General Electric Co.*, 894 F.2d 651, 658 (4th Cir.1990) (finding that conditioning a promotion on sexual favors established a *prima facie* case of *quid pro quo* sexual harassment). Because the person harassing the employee on a *quid pro quo* basis wields the employer's authority to alter the terms and conditions of employment, the law imposes strict liability on the employer for this form of harassment. *See Katz v. Dole*, 709 F.2d 251, 255 n. 6 (4th Cir.1983). Thus, if the employer has not conferred employment authority on the harasser, the employer cannot be held *strictly* liable under a *quid pro quo* theory for the harasser's conduct unless the employer failed to take remedial steps after learning of the harassment.

In this case, Martin was simply a work coordinator who supervised several employees. He did not have the power to hire or fire any of them, to promote or demote them, or to alter the terms and conditions of their employment. Because the entire basis for imposing strict liability based on a *quid pro quo* theory was absent, Reinhold's *quid pro quo* case must fail. While there was evidence that Martin refused Reinhold permission to go to a conference, this single refusal to attend a non-mandatory professional conference did not change the terms of Reinhold's employment. Even should denial of conference attendance be considered the alteration of a term or condition of employment, the alteration would be *de minimis*. Reinhold did not present evidence that established any link between attendance at the conference and a promotion or other tangible employment benefit. Reinhold's position, authority, or responsibilities were not threatened, and she suffered no reduction in her compensation as a result of her nonattendance at the conference. The same can be said with respect to the additional psychological evaluations that Martin assigned to Reinhold. In short, *quid pro quo* liability does not follow from such collateral and intangible events.

The majority opinion relies, to support its position, on the EEOC Guidelines which state that it is sufficient to establish a *quid pro quo* violation by showing that a "submission to or rejection of [sexually harassing] conduct ... [was] used as a basis for employment decisions *affecting such individual.*" Slip op. at 932 (emphasis added). The majority's reliance on the EEOC Guidelines, however, substantively extends our holdings in *Spencer* and *Katz*. Heretofore, our precedent required that the discriminatory employment decision affect "tangible aspects of the employee's compensation, terms, conditions, or privileges of employment," which is far narrower than a decision "affecting such individual." Yet, that is the very basis for the majority's opinion. As it holds, "Under the broad definition contained in *Spencer* and the EEOC Guidelines, we are convinced that Reinhold has shown that she was denied a 'job benefit' and that Martin used Reinhold's rejection of his advances as the 'basis for employment decisions' *affecting Reinhold.*" Slip op. at 933 (emphasis added).

In extending employer strict liability to this extent, the majority opinion fails to rec-

ognize the essential basis justifying the imposition of strict liability in the first place, i.e., that the employer have expressly conferred on the harassing person its employment authority vis-a-vis the victim. For these reasons, I would reverse and remand for entry of judgment in favor of the defendants.