66 F.3d 705
 69 Fair Empl.Prac.Cas. (BNA) 1255,
66 Empl. Prac. Dec. P 43,684
Peggy M. SPICER, Plaintiff-Appellee,
v.
COMMONWEALTH OF VIRGINIA, DEPARTMENT OF CORRECTIONS,
Defendant-Appellant,
and
Buckingham Correctional Center; David Smith, in his
capacity as the Warden of Buckingham Correctional Center,
Commonwealth of Virginia Department of Corrections; J.M.
Perutelli, Captain, Defendants.
Peggy M. SPICER, Plaintiff-Appellant,
v.
COMMONWEALTH OF VIRGINIA, DEPARTMENT OF CORRECTIONS;
Buckingham Correctional Center; Buckingham Correctional
Center; David Smith, in his capacity as the Warden of
Buckingham Correctional Center, Commonwealth of Virginia
Department of Corrections; J.M. Perutelli, Captain,
Defendants-Appellees.
 Nos. 93-2136, 93-2182.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1995.
Decided Oct. 2, 1995.
 
 ARGUED: Guy Winston Horsley, Jr., Senior Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellant. Tinya Lynnette Banks, Leftwich & Douglas, Washington, DC, for Appellee. ON BRIEF: James S. Gilmore, III, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellant. Natalie O. Ludaway, Brian K. Pearlstein, Leftwich & Douglas, Washington, DC, for Appellee.
 Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL and MOTZ, Circuit Judges.
 Judgment vacated and case remanded by published opinion. Judge NIEMEYER wrote the opinion for the court in which Judges RUSSELL, WIDENER, HALL, WILKINSON, WILKINS, HAMILTON, LUTTIG, and WILLIAMS joined. Judge MOTZ wrote a dissenting opinion in which Chief Judge ERVIN and Judges MURNAGHAN and MICHAEL joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Peggy M. Spicer, a rehabilitation counselor employed by the Virginia Department of Corrections at the Buckingham Correctional Center, filed a complaint under Title VII of the Civil Rights Act of 1964, alleging (1) sexual harassment in the form of remarks made to her by fellow employees and (2) retaliation by her employer for filing a sexual harassment complaint with the federal Equal Employment Opportunity Commission (EEOC). The jury found against Spicer on her retaliation claim, but, following a court trial, the district court ruled in her favor on the sexual harassment claim. The district court also awarded Spicer attorneys fees which were apparently incurred in connection with both claims of her suit.
 
 
 2
 Because the jury's verdict is adequately supported by the evidence, we affirm that verdict. In connection with the sexual harassment claim, however, we reverse because the Virginia Department of Corrections acted immediately and effectively to eliminate the offensive, yet isolated, behavior of Spicer's fellow employees. Therefore, we also reverse the award of attorneys fees because Spicer is not a prevailing party.
 
 
 3
 * Buckingham Correctional Center, where Spicer was employed, is a maximum security prison housing approximately 1,000 male felons. A majority of the felons have been convicted for violent crimes and 37 percent for sexual offenses. For significant security reasons, especially the safety of its female employees, the institution maintains an informal dress policy prohibiting employees from dressing in any manner that might arouse the inmates. As Warden David Smith testified:
 
 
 4
 [B]ased on my experience, there is certain appropriate ways to dress and certain appropriate ways you don't dress around inmates. And I think it is just more a matter of common sense in that type of environment. I have seen staff held hostage; I have seen staff assaulted; I've seen a lot of things. I've seen attempted rapes on staff. And all of these things you bring with your experience to bear that there is a right and a wrong way to dress in that environment....
 
 
 5
 The staff's informal dress policy parallels the formal dress code imposed on visitors to the prison.
 
 
 6
 In July 1991, an elderly woman visiting the prison to see her son, who was incarcerated there, complained irately to Lt. Antoinette Yates about the attire of Spicer, the counselor on duty that day. Referring to Spicer, the visitor stated, "I can't believe that as tough as you are with the visitor's dress code that you would allow one of your employees to come into your institution dressed like this." The visitor threatened to complain to the warden. Lt. Yates looked at Spicer and concurred that her attire was inappropriate. As Lt. Yates testified:
 
 
 7
 She had on a pullover sweater. If you would excuse me--I'm very embarrassed--her nipples were plainly viewed like she didn't have a bra on.
 
 
 8
 Yates reported the visitor's complaint to the captain of the security force, Capt. J.M. Perutelli. Capt. Perutelli, who had received complaints from other visitors about the dress of employees at the institution, wrote a memorandum to Warden Smith dated August 1, 1991, about the inappropriate dress of several employees. The portion of the August 1 memorandum discussing Spicer's dress stated:
 
 
 9
 Numerous security staff have received complaints from inmates complaining that female staff are allowed to enter the institution in clothing that their visitors would not be allowed to wear. Some specific examples include ... Miss Spicer wearing short dresses with a split in the back and blouses that are so revealing that you can see her breast nipples outlined in plain view.
 
 
 10
 Capt. Perutelli requested that Warden Smith "address" this matter. Warden Smith forwarded the August 1 memorandum to the supervisors of the employees involved, together with a cover letter directing the supervisors to "take appropriate action." Warden Smith admitted in retrospect, however, that he had erred in failing to label the memorandum "confidential." A few days later, on August 6, 1991, Warden Smith sent an additional memorandum to all department heads advising them that employees must dress "in a professional manner." That memorandum noted that the employees deal with an "extremely difficult section of society," and "[w]e should all take this opportunity to examine our wardrobes and appearance to ensure that we dress professionally at all times."
 
 
 11
 Two of the managers to whom the August 1 memorandum was sent, Mr. B.W. Soles and Ms. L. Dixon, read the memorandum out loud at their staff meetings. Beginning on August 6, 1991, in response to the memorandum, a few fellow employees subjected Spicer to various sexually offensive comments such as: "This is nipple check day," "Which one is bigger?" and "Where are you going to put them?" Both angry and upset by these remarks, Spicer promptly complained to her immediate supervisor, Barbara Wheeler, telling Wheeler that she wanted to talk to Warden David Smith. Wheeler called Smith to indicate that Spicer wanted to see him, without mentioning the reason for the requested visit. Warden Smith was in a meeting, but Spicer was advised that she could meet with him the following morning. The next morning, August 7, Spicer instead called Bob Sizer, the equal employment officer for the Department of Corrections, to complain, and on August 8 she met with Sizer in Richmond. After meeting with Spicer on August 8, Sizer consulted with Ed Morris, the Deputy Director for Adult Institutions in Virginia, who in turn promptly called Warden Smith and had him investigate whether the August 1 memorandum had been posted on any bulletin boards or in any other public places. Warden Smith informed Morris that the memorandum had not been posted anywhere but on the clipboards of Capt. Perutelli and the "12-8 Watch Commander." Capt. Perutelli's clipboard was private, and there is no indication in the record that the 12-8 Watch Commander's clipboard was not likewise private. In response to Morris' call, Warden Smith also met individually with Spicer and most of the other women mentioned in the August 1 memorandum to discuss their concerns. Smith then counseled those individuals who made the inappropriate sexual comments to Spicer and threatened disciplinary action if such conduct was repeated. Finally, Warden Smith spoke with Capt. Perutelli, expressing his concern that the memo had been too graphic.
 
 
 12
 The next morning, August 9, 1991, Sizer conducted an informal training session on sexual harassment which was attended by approximately 23 employees. The session lasted for one to one and one-half hours. Sizer led a second training session about a month later. This session was attended by about 30 employees, lasted about two hours, and included a 40-minute film titled "The Other Point of View." Finally, Sizer wrote Spicer a letter detailing the steps taken by the Department of Corrections to address her complaint. He concluded this letter as follows:
 
 
 13
 It is unfortunate that a situation of this nature developed, but, we can assure you that Administrative action was taken with appropriate individuals to help prevent future problems like this from occurring.
 
 
 14
 I hope that the work environment has improved and I will be glad [to] meet with you at anytime to discuss any further concerns that you might have.
 
 
 15
 Spicer acknowledged that after Sizer became involved in addressing her complaint on August 7, no one made any further sexually offensive remarks to her.
 
 
 16
 About two months later, Spicer filed a complaint for sexual harassment with the EEOC. The Virginia Department of Corrections was advised of the complaint in early December 1991.
 
 
 17
 On December 5, 1991, Warden Smith removed Spicer from the Buckingham Correctional Center's work committee, which assigns prison jobs to inmates. He testified that he did so because he disagreed with Spicer about how the work committee should function and because he had received complaints from inmates and staff concerning her performance. He also stated that Spicer had acted outside of her authority in chairing some committee meetings. Following the filing of a grievance in which Spicer contended that her removal from the work committee was in retaliation for her filing the EEOC complaint, the Director of the Department of Employee Relations Counselors reinstated Spicer to her position on the work committee.
 
 
 18
 In September 1992, after receiving a right to sue letter from the EEOC, Spicer filed this action, alleging that the Virginia Department of Corrections, Warden Smith, and Captain Perutelli discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e, et seq. She contended that the defendants (1) created a sexually hostile work environment and (2) retaliated against her by removing her from the work committee when she filed an EEOC complaint for the sexual harassment. Through a special verdict, the jury found that the Virginia Department of Corrections had retaliated against Spicer but that Spicer would have been removed from the work committee even in the absence of the improper motive. Accordingly, it returned a verdict in favor of the Department of Corrections. The sexual harassment claim was tried to the court, which found that Spicer had established that she was subjected to unwelcome, sexually-based harassment and that such harassment was sufficiently pervasive and severe to create an abusive working environment. The district court also concluded that "[d]efendant, when informed of these incidents, failed to take effective remedial action." Finding that the defendants had violated Title VII, the district court entered an injunction ordering remedial action and awarded Spicer attorneys fees in the amount of $29,796.93.
 
 
 19
 On appeal, a divided panel of this court affirmed the district court's rulings on liability, but remanded the case to the district court to award attorneys fees only in connection with the sexual harassment claim. 44 F.3d 218. In affirming the finding of sexual harassment, the panel concluded, without the benefit of any factual findings by the district court, that the employer's "response [to Spicer's complaint] was inadequate" because (1) the employer failed to retract its August 1 memorandum, which the panel concluded was "improper"; (2) the employer's counseling was ineffective because the author of the August 1 memorandum only grudgingly acknowledged that it may have been too explicit, while maintaining that the graphic statements made in the memorandum were true; (3) the employer's EEOC compliance officer "did not inspire confidence in the effectiveness of the [Department's] remedial action" because he did not control who attended the training sessions and he lacked sophistication about what constituted appropriate Title VII training; and (4) "there is scant evidence that all persons guilty of sexual harassment actually attended" the training sessions. 44 F.3d at 226-227.
 
 
 20
 In ordering a rehearing en banc, we vacated the panel decision, and now we vacate the district court's judgment, reversing its conclusion that the Department of Corrections failed to take effective remedial action and its award of attorneys fees.
 
 II
 
 21
 The applicable provision of Title VII, on which Spicer relies for her claim, makes it unlawful for an employer "to discriminate against any individual with respect to [her] ... terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. Sec. 2000e-2(a)(1). To establish a claim for sexual harassment under this provision, the plaintiff employee must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. See Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); Swentek v. USAIR, Inc., 830 F.2d 552, 557 (4th Cir.1987). On the fourth element for establishing employer liability, we have repeatedly held that an employer cannot be held liable for isolated remarks of its employees unless the employer "knew or should have known of the harassment, and took no effectual action to correct the situation." See Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983) (emphasis added). We reiterated this requirement in Swentek, holding that an employer is liable only "where it had 'actual or constructive knowledge of the existence of a sexually hostile work environment and took no prompt and adequate remedial action.' " 830 F.2d at 558 (quoting Katz ) (emphasis added). Knowledge of work place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with Title VII, would be aware of the conduct.
 
 
 22
 On the first three elements of a Title VII violation for sexual harassment, the district court found in this case that the work place remarks made to Spicer by her fellow employees were unwelcome and were based on her sex. The court also concluded that the conduct was "sufficiently pervasive and severe to create an abusive working environment." To support these conclusions, the court found that as a result of her fellow employees' comments, "Spicer altered the manner in which she performed her duties and responsibilities, and her well-being was being affected. She spent increased time in her office away from her coworkers, began wearing increased layers of clothing, and suffered emotional harm."
 
 
 23
 On the fourth element, critical to employer liability, the district court merely stated, "Defendant, when informed of these incidents, failed to take effective remedial action." No facts were found or reasons given to support this conclusion.
 
 
 24
 A review of the record, however, reveals that the district court's conclusion that the employer failed to take effective remedial action either is an error of law, or, if interpreted as a finding of fact, is clearly erroneous. Undisputed facts in the record show that on the very day Spicer complained to her employer about the memorandum and the sexually offensive remarks, action was taken (1) to assure that the memorandum was not publicly posted, (2) to counsel those involved in writing and distributing the memorandum about treating such matters more sensitively, and (3) to admonish those making inappropriate sexual remarks that such conduct would not be tolerated. In addition, two training sessions were conducted to educate employees and to prevent the recurrence of such remarks. There is no evidence in the record to indicate that the incident was other than the brief, isolated result of an inartfully drafted memorandum addressing a legitimate and important concern.
 
 
 25
 While we have never suggested that an employer must make the most effective response possible and we have consistently held that an employer is only liable for sexual harassment committed by its employees if no adequate remedial action is taken, the record in this case does not even colorably support a conclusion that the Virginia Department of Corrections' response was inadequate. This is especially true in light of Spicer's concession that no further offensive remarks were made after the Department's equal employment officer intervened on August 7. The evidence about the Department of Corrections' response to Spicer's complaints is undisputed, as is the effectiveness of the response in eliminating the problem. Yet the district court made no reference to the employer's response but concluded summarily, without reference to any facts, that the employer "failed to take effective remedial action." Cf. Fed.R.Civ.P. 52(a) ("In all actions tried upon the facts without a jury ..., the court shall find the facts specially and state separately its conclusions of law thereon").
 
 
 26
 To hold the Virginia Department of Corrections liable under these circumstances would be tantamount to imposing strict liability on an employer for all work place conversations that are inappropriate, regardless of the employer's knowledge of them or response. Such a holding would dramatically change the law regarding employer liability for sexual harassment in the work place.*
 
 
 27
 The work place is a complex and diversified community in which employees work closely and continuously in each other's presence over long hours, during which, experience has shown, inappropriate conduct occurs from time to time. While employers can and should be required to adopt reasonable policies aimed at preventing illegal conduct and to take reasonable measures to enforce these policies, they cannot be held to a standard under which they are liable for any and all inappropriate conduct of their employees. When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well. Employers cannot be saddled with the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct or the remedial measures taken in response to such conduct.
 
 
 28
 In this case, the Virginia Department of Corrections responded both promptly and effectively, eliminating completely the offensive conduct of the kind directed at Spicer. In these circumstances we hold that the employer is not liable for the isolated but offensive conduct of its employees.
 
 III
 
 29
 Spicer's claim that the Department of Corrections illegally retaliated against her because she filed a complaint with the EEOC was submitted to a jury, which was given two questions to answer. The first was whether "the filing of a civil rights complaint by plaintiff was a motivating factor in Defendant's decision to remove [Spicer] from the Work Committee in December of 1991," and the second was whether Spicer "would have not been removed from the work committee in the absence of retaliatory motive." The jury responded by finding that the employer did retaliate against Spicer but also that the employer still would have removed Spicer from the work committee in the absence of a retaliatory motive. Accordingly, the jury awarded Spicer no damages.
 
 
 30
 Spicer contends that the jury's verdict should be set aside because it was against the clear weight of the evidence and was clearly erroneous. We will not, however, set aside a jury verdict unless "the evidence, viewed in the light most favorable to the parties supporting the jury's verdict, is so clear that reasonable persons could reach no other conclusion than that asserted on appeal." Coates v. Daugherty, 973 F.2d 290, 293 (4th Cir.1992). In this case, the record, considered in the light most favorable to the Department of Corrections, shows that Warden Smith removed Spicer from the work committee because of their philosophical differences about the committee, because of inmate and staff complaints, and because she chaired work committee meetings when she was not authorized to do so. That evidence rationally supports the verdict returned by the jury. Accordingly, there is no basis for us to set it aside.
 
 
 31
 Finally, since Spicer is not a prevailing party, she is not entitled to an award of attorneys fees. See 42 U.S.C. Sec. 1988(b).
 
 
 32
 For the reasons given, the judgment of the district court is vacated, and the case is remanded to enter judgment for the defendants.
 
 
 33
 IT IS SO ORDERED.
 
 MOTZ, Circuit Judge, dissenting:
 
 34
 After carefully considering all of the evidence, including the testimony of nine witnesses, an experienced trial judge found that not only had Ms. Spicer "established that she was subjected to unwelcome sexually-based harassment ... that ... create[d] an abusive working environment," but also that "her employer, having knowledge of the problem, failed to take ... adequate remedial action." Undoubtedly, the finding as to the adequacy of her employer's remedial action is a finding of fact. See Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir.1989) (in a Title VII sexual harassment case "[t]he adequacy of [the employer's] remedy is a question of fact"), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc); Dwyer v. Smith, 867 F.2d 184, 187 (4th Cir.1989).[1] Such findings are entitled to great deference and can be reversed only if clearly erroneous. See FED. R. CIV. P. 52(a). Thus, a reviewing court cannot reverse a finding "of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Nor is it proper for a reviewing court to "conduct[ ] ... a de novo weighing of the evidence in the record." Id. at 576, 105 S.Ct. at 1513. Because the majority here reverses on the basis of precisely the sort of improper de novo review condemned in Anderson v. City of Bessemer City, I respectfully dissent.
 
 
 35
 The record reveals that there was clearly sufficient evidence presented at trial to support the district court's finding that the Department of Corrections failed to take adequate remedial action. It was undisputed that the Department never officially or unofficially retracted or apologized for the public dissemination of the August 1 memorandum, even though the Department itself admitted that public dissemination of the memorandum was improper. See generally, 44 F.3d at 226-28. It was similarly undisputed that, other than counseling, the Department undertook no disciplinary action against any employee for that employee's part in making or disseminating the harassing statements; indeed, shortly after these incidents, the Department promoted the author of the memorandum. Id.
 
 
 36
 There was abundant evidence that the counseling and training that were undertaken by the Department were ineffective. For example, both the author of the memorandum and the warden, although they had assertedly been "counseled" and "trained," testified at trial that in their respective views the memorandum was neither "too explicit" nor "inappropriate." Id. Further, the Department's EEO manager, who conducted the Department's remedial training sessions, had, in his own words, "not conducted any training on sexual harassment in quite awhile," did not require anyone to attend the training sessions, did not know who attended the sessions and did not remember much of what was taught. Id. The district court found that the EEO manager, himself, was "insensitive" to sexual harassment. Id. Moreover, the Department, after conceding that it knew of the harassment, and in the face of this evidence that its remedial training and counseling were inadequate, failed to prove that all, or even most, of the persons who engaged in the sexual harassment attended any remedial training session. Id. at 227.
 
 
 37
 Of course, as noted in the opinion of the panel majority "a factfinder could have held differently on these facts," i.e. could have concluded that the remedial measures were adequate. Id. Thus, as in Anderson, two interpretations of the facts were possible, neither of which was "illogical or implausible." 470 U.S. at 577, 105 S.Ct. at 1513. Unfortunately, in the case at hand, this court makes the same mistake it made in Anderson, "improperly conduct[ing] what amount[s] to a de novo weighing of the evidence in the record," and failing "to give due regard to the ability of the District Court to interpret and discern the credibility of oral testimony." Id. at 576-77, 105 S.Ct. at 1513. Unlike any member of this court, the district judge was able to view and listen to all of the witnesses, including the author of the memorandum, the warden, the Department's EEO manager, and Ms. Spicer. After doing so, the trial judge concluded that the Department had not provided effective training on employment discrimination and ordered it to formulate such training. When a trial court's finding is based on such credibility determinations, the Supreme Court has cautioned that "Rule 52(a) demands even greater deference" to that finding; "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson, 470 U.S. at 575, 105 S.Ct. at 1512. In sum, in reversing here, the majority of this court repeats the very mistakes it made in Anderson.
 
 
 38
 Moreover, even if the majority of the en banc court were correct, this heavily fact-dependent case was not appropriate for en banc consideration. The federal rules expressly provide that en banc review "is not favored" and ordinarily will not be ordered except when needed to secure "uniformity of ... decisions" or in cases of "exceptional importance." FED. R. APP. P. 35(a). This case certainly did not merit en banc consideration to promote uniformity of decisions; the entire court is in agreement on the relevant governing legal principles. Indeed, every case cited in the majority opinion of the en banc court was first cited, for the identical proposition, in the opinion of the panel majority. We differ only in the application of these principles to the facts of this case.
 
 
 39
 Nor is this case one of "exceptional importance" within the meaning of Rule 35(a). "There is now general agreement among the circuits that the 'truly extraordinary' cases meriting en banc treatment are ... those of real significance to the legal process as well as to the litigants." Church of Scientology of California v. Foley, 640 F.2d 1335, 1341 (D.C.Cir.) (Robinson, J., dissenting) (footnotes omitted), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). This is not such a case. The interpretation of the facts imposed by the majority will have some impact on the litigants,[2] but this en banc decision will have no appreciable effect on the legal process. See Jolly v. Listerman, 675 F.2d 1308, 1310 (D.C.Cir.) (Robinson, C.J., concurring in denial of rehearing en banc ) (when the panel majority and dissent have already set forth in detail their respective interpretations of the record, "[n]o jurisprudential value is enhanced by having the facts aired and debated again" before an en banc court.), cert. denied, 459 U.S. 1037, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982); United States v. Rosciano, 499 F.2d 173, 174 (7th Cir.1974) (per curiam) ("The function of en banc hearings is not to review alleged errors for the benefit of losing litigants.").
 
 
 40
 Following the strictures of Rule 35(a) is not easy; it requires both discipline and trust. See Bartlett v. Bowen, 824 F.2d 1240, 1244 (D.C.Cir.1987) (Edwards, J. concurring in denials of rehearing en banc), cert. denied, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988) ("under [Rule 35(a) ], it is well understood that it is only in the rarest of circumstances when a case should be reheard en banc. In other words, for the appellate system to function, judges on a circuit must trust one another and have faith in the work of their colleagues, including Senior Judges and visiting judges from other circuits."). However, failure to follow the rule results in "expense and delay for the litigants" and a "drain" on all too scarce judicial resources. Air Line Pilots Assoc., Intl. v. Eastern Air Lines, Inc., 863 F.2d 891, 925 (D.C.Cir.1988) (Ruth Bader Ginsburg, J. concurring in denial of rehearing en banc), cert. dismissed, 501 U.S. 1283, 112 S.Ct. 38, 115 L.Ed.2d 1119 (1991).
 
 
 41
 For all of these reasons, this case is inappropriate for full-court review, and rehearing en banc was improvidently granted. Judge Rubin's remarks in a similar context resound here:
 
 
 42
 We ought to mobilize our en banc forces only to meet urgent legal necessity, not to belabor facts or to correct putatively errant panels. The light we shed here is not worth the thirteen-judge candle.
 
 
 43
 Nash v. Estelle, 597 F.2d 513, 534 (5th Cir.) (Rubin, J. dissenting), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).
 
 
 44
 Chief Judge ERVIN, Judge MURNAGHAN, and Judge MICHAEL have authorized me to indicate that they join in this dissent.
 
 
 
 *
 The dissenting opinion concludes that this case is not "appropriate for en banc consideration" because the issues are "heavily fact-dependent." The opinion argues that the case is not one of exceptional importance and therefore the strictures of Rule 35(a) for en banc hearings have not been followed. It observed that judges on a circuit court must "trust one another," suggesting that the circuit judges should yield to the decisions of their colleagues, even if they believe them to be wrongly decided
 What is not acknowledged in the dissenting opinion, however, is the fact that the panel opinion in this case, if left to stand, would have effected a significant change to Title VII jurisprudence. Every employer would have been subjected to a new and substantial duty, approaching absolute liability, for isolated workplace misconduct--a duty that would have gone well beyond any that is fairly required by Title VII. That such an issue is of significant importance to the circuit is manifested by the fact that at least a majority of the judges of this court voted to rehear this case en banc.
 
 
 [1]
 The majority suggests that the trial judge "concluded" that defendants' remedial action was ineffective "without the benefit of any factual findings." Slip Op. at 709. See also id. at 710-11. This suggestion misses the mark; as the authorities cited above make clear, what the majority characterizes as a conclusion is itself a finding of fact, and as such, is entitled to deference. Accord Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("a finding of intentional discrimination is a finding of fact"). To be sufficient under Rule 52(a), a trial court's findings need only " 'be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied.' " Feazell v. Tropicana Products, Inc., 819 F.2d 1036, 1042 (11th Cir.1987), quoting Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc., 520 F.2d 1030, 1034 (5th Cir.1975). In my view, the findings of the court below, including its finding as to the inadequacy of the remedial action, satisfy this requirement. However, if that finding were inadequate, the appropriate course would be not to declare it clearly erroneous, as the majority does, but to remand the case for more detailed findings. See, e.g. EEOC v. United Virginia Bank/Seaboard Nat'l, 555 F.2d 403, 406 (4th Cir.1977); Atlantic Thermoplastics Co. v. Faytex Corp., 5 F.3d 1477, 1479 (Fed.Cir.1993); Redditt v. Mississippi Extended Care Centers, Inc., 718 F.2d 1381, 1386 (5th Cir.1983)
 
 
 [2]
 Even that impact is minimal. The sole relief ordered by the district court was that the Department formulate "training relating to employment discrimination, with particular emphasis on issues of sexual harassment" and "take positive steps to assure the effectiveness of its existing policy against sexual harassment." At oral argument we were informed that the Department has already taken such steps and instituted such a training program, both of which have been approved by the district court, and that the Department does not seek to be relieved from these obligations. Accordingly, the only effect of the en banc decision is to eliminate the Department's liability for Ms. Spicer's reasonable attorney's fees