Crystal **BARBER**, Plaintiff,

v.

**CITY OF CONOVER**, Defendant.

No. Civ. 5:97CV176–H.

United States District Court, W.D. North Carolina, Statesville Division.

March 5, 1999.

Phyllis A. Palmieri, Morganton, NC, for Crystal Barber, plaintiff.

Monroe Pannell, Martin & Monroe Pannell, P.A., Conover, NC, Patricia L. Holland, Patrick H. Flanagan, Cranfill Sumner & Hartzog, L.L.P., Raleigh, NC, for Conover City, defendant.

## MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the following motions and supporting memoranda:

1. "Defendant's Motion for Summary Judgment" filed December 21, 1998 (document # 20);
2. "Memorandum of Law in Support of Defendant's Motion for Summary Judgment" filed December 21, 1998 (document # 21);
3. "Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment" filed January 25, 1999 (document # 25);
4. "Plaintiff's Rule 56(f) Motion" January 25, 1999 (document # 24);
5. Plaintiff's "Request for Hearing on Plaintiff's Opposition to Defendant's Motion for Summary Judgment" January 25, 1999 (document # 26);
6. "Defendant's Reply In Support of Summary Judgment" filed February 5, 1999 (document # 27);
7. "Defendant's Response in Opposition to Plaintiff's F.R.Civ.P. 56(f) Motion" filed February 5, 1999 (document # 28); and
8. "Plaintiff's Reply to Defendant's Opposition to Plaintiff's Rule 56(f) Motion" filed February 18, 1999 (document # 29).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these matters are ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will *deny* "Plaintiff's Rule 56(f) Motion" and her "Request for Hearing on Plaintiff's Opposition to Defendant's Motion for Summary Judgment," and will *grant* "Defendant's Motion for Summary Judgment."

## I. PROCEDURAL AND FACTUAL BACKGROUND

In December 1992, Plaintiff Crystal Barber, then twenty-two years old, sought employment as a firefighter with the Defendant City of Conover ("the City"). Accompanied by her mother, Faye Mull, who had been a volunteer firefighter for several years, Plaintiff approached City Fire Chief Reid Poovey to discuss employment possibilities with the City. At that time, Chief Poovey indicated that the City did not have an opening for a paid firefighter, but that Plaintiff might gain valuable experience and increase her chances of getting a job if she spent time working as a volunteer with the Conover Volunteer Fire Department ("the CVFD").

Plaintiff agreed with Chief Poovey's suggestion and immediately applied to the CVFD for membership. Volunteer firefighters are selected by a vote of the member volunteers. Chief Poovey personally sponsored Plaintiff's membership application, and following an affirmative vote of the membership, Plaintiff began working with the CVFD as a volunteer firefighter in December 1992.

The CVFD provides a small number of volunteer firefighters to the Defendant City of Conover on a contract basis. According to the contract in effect at that time, the City paid $867 per month to the CVFD in exchange for the provision of "a qualified operator driver to be available for response of apparatus between the hours of 6:30 a.m. of each Saturday, through 6:30 a.m. of the following Monday." The contract also provided that:

VFD shall be solely responsible for selection, scheduling, conduct, and all other aspects of the performance of the agreements herein provided for, and the same shall be under the direction of the volunteer members of the VFD.

In addition to providing weekend fire response coverage, volunteer firefighters are free to assist the City Fire Department on calls during the week, although they are not required to do so. In fact, the CVFD does not assign duty hours or utilize any type of work schedule, except business meetings which were usually held on Tuesday evenings.

According to former CVFD Treasurer Ray Hager, the $867.00 paid to the CVFD (which maintains its own bank account) was distributed to volunteer firefighters in the *de minimis* amount of $7.00 per fire call to which the volunteer had responded, and to the volunteers who covered the weekends at a rate of "$100 or $90 for 24 hours." These funds are intended to reimburse the volunteers for their expenses, including gasoline, uniforms, and dry-cleaning services, not as income for services rendered. Although the City pays for additional training for volunteer firefighters who are interested, it pays no wages or benefits directly to the volunteers, deducts no payroll or Social Security taxes on the monthly payment to the CVFD, and does not allow CVFD members to participate in its retirement plan.

Under the CVFD bylaws, the Fire Chief of the City of Conover serves as the "administrative head" of the CVFD. Likewise, according to current Fire Chief Hall, the job of Fire Chief "includes both the supervision of the paid members of the City Fire Department and the volunteers." Indeed, the Conover Fire Department's "Organizational Chart" lists the Fire Chief at the top, and has several positions falling lower in the hierarchy of positions designated as "volunteers." Furthermore, all membership applications are submitted first to the Fire Chief, and the CVFD uses

facilities and equipment owned solely by the City.

Volunteers and career firefighters alike are monitored and certified by the North Carolina Fire and Rescue Commission, and the specific duties which an individual can perform are determined by his or her level of certification. As a volunteer firefighter, Plaintiff obtained substantial training in firefighting techniques, and ultimately attained the status of Level I fire inspector. However, because she was unable to complete the Emergency Vehicle Driving certification test in December 1993, she never progressed beyond a Level I.[1]

In July 1994, Chief Poovey suggested that Plaintiff take on some additional clerical duties, whereby in exchange for hourly compensation from CVFD funds, Plaintiff assisted in the preparation and filing of incident reports, computer data entry, and answering incoming phone calls. Plaintiff contends that she was the only person asked or permitted to take on such additional compensated duties. The City did not include reimbursement for amounts paid for clerical services as an explicit part of its contract with the CVFD until 1996. Plaintiff also alleges that Chief Poovey allowed her to become, as her mother had once been, a "Fire Prevention Officer," assigned to conduct fire safety educational programs for the public.

At the heart of her claim, Plaintiff alleges that beginning in 1993, Chief Poovey began to subject her to unwelcome personal comments and/or touching. The record is unclear as to the actual inception of the alleged conduct, and provides no details regarding the precise nature of the alleged harassment until January 1996.[2] It is un-

---

1. In "Plaintiff's Response in Opposition ...," Plaintiff's counsel alleges that Plaintiff had difficulty with the "straight drive" emergency vehicle used for the test due to her diminutive size; that the other members of the CVFD refused to accompany her on a sufficient number of training runs; and that she was not allowed to use an automatic transmission vehicle when taking the driving test. Howev-

er, there is no citation to the record in support of these bare assertions of fact.

2. The information provided from that point forward is contained in the form of diary entries made by Plaintiff during 1996; it is therefore not sworn testimony and is of limited utility to the Court in determining Plaintiff's motion.

disputed however, that Plaintiff first complained to City officials regarding Chief Poovey on August 25, 1995, at which time her attorney called City Manager Rick Beasley. Although Beasley did not consider Plaintiff a City employee, he agreed to meet with Plaintiff to discuss her concerns.

On September 1, 1995, Beasley met with Plaintiff and her husband; at that time, after hearing Plaintiff's complaints, he suggested removing Chief Poovey from direct supervision of Plaintiff and, indeed, of the CVFD as well. Beasley testified that Poovey was close to retirement, and that it made sense for the incoming Fire Chief, Eric Hall, to begin assuming the day-to-day supervision of the CVFD. Plaintiff agreed that such a move would be "a good start."

Although Chief Poovey denied Plaintiff's accusations once confronted by Beasley, he agreed to meet with Plaintiff and Beasley to discuss her concerns. At a meeting on September 7, 1995, Barber told Poovey that she had become "very uncomfortable around him," and Poovey apologized. The parties agree that at that meeting Poovey was admonished to cease his excessively personal conduct; that Plaintiff should contact Beasley if there were any further incidents; and that Chief Hall would begin supervising Plaintiff from that point forward. Although Plaintiff notes incidents in her diary in which she thought Chief Poovey was excessively "clingy" or hugged her when he should not have, she never brought any further complaint to Mr. Beasley's attention. Rather, the Plaintiff's next notice of her dissatisfaction came in her formal charge of discrimination filed shortly before Chief Poovey's retirement in September 1996.

In May 1996, Plaintiff again attempted-but again failed-the Emergency Vehicle Driving certification exam, and thus remained at that time a probationary Level I Fire Inspector. In December 1996, the City announced an opening for a Fire Inspector/Engineer, for which position Plaintiff applied. The City contends that Plaintiff was denied this position because it required the applicant to be able to operate the fire engine, which Plaintiff was unable to do both physically and legally, in terms of certification. The position was filled by Bruce Roseman, who was certified to operate the engine and also had advanced training in "pump discipline."

This position came open once again in July, 1997 when Roseman left the City Fire Department. At that time, the City dropped the engine operation requirements, but did require Level II Fire Inspector certification, which Plaintiff continued to lack. Although Plaintiff again applied, the position was given to Bobby Hedrick, a Level II certified inspector scheduled to sit for his Level III certification shortly thereafter.

On September 24, 1996, prior to the initial opening of the Fire Inspector position, Plaintiff had filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining that she had "recently been demoted to receptionist" from her position as Fire Prevention Officer; that she had been subjected to sexual harassment by her supervisor, Chief Poovey; that she had complained about this harassment "[o]n several occasions ..., but nothing was done, and the sexual attention has continued despite my complaints to the City Manager Rick Beasley;" and that she had been discriminated against because of her gender and in retaliation for having complained about Poovey's behavior. The EEOC issued Plaintiff a right-to-sue letter on September 4, 1997.

On October 13, 1997, Plaintiff filed the instant action in Catawba County Superior Court alleging gender discrimination, a hostile work environment, and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as well as several state law claims. The named Defendants (the City of Conover, the Conover Fire Department, and City Manager Rick Beasley) removed the action to this Court, and shortly thereafter filed a motion to dismiss certain portions

of the Complaint. In an "Order of Partial Dismissal" dated June 29, 1998, the undersigned, with Plaintiff's consent, dismissed all claims except the Title VII claims against the City of Conover.

Following an Initial Pretrial Conference held in the chambers of the undersigned on February 19, 1998, the Court issued a Pretrial Order and Case Management Plan which set a discovery cut-off date of November 19, 1998. During the course of discovery, the parties exchanged written interrogatory responses and a number of documents. On November 6, 1998, thirteen days before the expiration of the discovery period, Plaintiff's counsel served five Notices of Deposition, including one for former Chief Poovey, all scheduled to take place on November 19, 1998. Plaintiff's counsel failed to discuss with defense counsel whether they or the noticed witnesses would be available on that date. In fact, Defendant's primary counsel, Patricia Holland, was scheduled to be married on November 8, 1998, and to be out of town on her honeymoon on November 19, 1998.

Ms. Holland's colleague, Raymond Davis, agreed to cover the depositions for her, and notified Plaintiff's counsel in a letter dated November 11, 1998 and a subsequent telephone conversation that since Poovey and two of the other witnesses were no longer employed by the City, he could not guarantee their attendance. Mr. Davis suggested that Plaintiff subpoena those individuals for deposition.

On the appointed day, the last day of the discovery period, all of the noticed individuals appeared to be deposed, except former Chief Poovey. On that date, Plaintiff's counsel represented that she had unsuccessfully attempted to locate and serve Chief Poovey with a subpoena. At no time, however, did Plaintiff's counsel bring any of these facts to the Court's attention, file a motion to compel, or otherwise request an extension of the discovery period until after Defendant filed its Motion for Summary Judgment on December 21, 1998.

Rather, on January 25, 1999, along with her opposition to the City's Motion for Summary Judgment, Plaintiff filed a ". . . Rule 56(f) Motion," requesting therein that the Court "order the Defendants [sic] to allow the Plaintiff to obtain the deposition of J. Reed Poovey" and to stay its ruling on the motion for summary judgment until after such time as the deposition could be taken.

## II. *DISCUSSION OF CLAIMS*

### A. *The Summary Judgment Standard.*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted only when the pleadings, responses to discovery, and the record reveal that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Federal Deposit Ins. Corp.*, 906 F.2d 972, 974 (4th Cir.1990); *Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir.1979).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. *Id.* at 249–50, 106 S.Ct. 2505. Rather, once the movant has met its burden, the non-moving party *must* come forward with specific facts demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When considering summary judgment motions, courts must view the undisputed facts and the inferences to be drawn therefrom in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2548. *Accord Matsushita Electric Indust. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986); *Miltier v. Beorn*, 896 F.2d 848 (4th Cir.1990); *and Cole v. Cole*, 633 F.2d 1083 (4th Cir.1980). However, summary judgment is appropriate "when it is clear that there is no dispute concerning either the [material] facts of the controversy or the inferences to be drawn from those facts." *Wall v. AT & T Tech., Inc.*, 754 F.Supp. 1084, 1089 (M.D.N.C.1990), *quoting Pulliam Invest. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

### B. *Plaintiff's Rule 56(f) Motion*

At the outset, the Court must deal with Plaintiff's request to re-open the discovery period to allow for the taking of Chief Poovey's deposition. The Pretrial Order and Case Management Plan entered by the undersigned on February 19, 1998, plainly provides in Section II. G:

> Counsel are directed to initiate discovery requests and notice or subpoena depositions *sufficiently in advance of the discovery completion deadline so as to comply with this Order.* Discovery requests that seek responses or schedule depositions after the discovery completion deadline are not enforceable except by order of the court for good cause shown.

(emphasis added.) While Plaintiff's proposed deposition for Chief Poovey was scheduled to take place on the last date of the discovery period, it was nonetheless not served "sufficiently in advance of the discovery completion deadline" under the circumstances.

■ The Court finds that Plaintiff's counsel's eleventh hour noticing of a deposition, scheduled for the last day of discovery, of a non-party witness known by Plaintiff to have retired from Defendant's employ, fails to comply with the letter and spirit of the Pretrial Order, as well as sound principles of wise litigation management.[3] Even more disturbing is Plaintiff's

counsel's failure to request an extension of the discovery period or other appropriate relief immediately upon learning that Chief Poovey might not be present to be deposed as noticed or might not be served with a timely deposition subpoena prior to the expiration of the discovery period.

Fed.R.Civ.P. Rule 16(f) governs the enforcement of pretrial case management orders:

> **Sanctions.** If a party or party's attorney fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

Consistent therewith, the Court will deny Plaintiff's Rule 56(f) motion and proceed to decide the instant motion for summary judgment on the record properly before the Court.

### C. *Timeliness and Scope of Title VII Claims*

The Court must next address the proper scope of Plaintiff's Title VII claims. Plaintiff contends that she was subjected to both gender discrimination and a hostile work environment. To pursue these claims, Plaintiff must have filed a proper complaint with the EEOC within 180 days of the most recent incident. 42 U.S.C. § 2000e–5(e)(1) (1998). "Incidents outside of the statutory window are time-barred unless they can be related to a timely

---

**3.** The fact that Defendant did not take *Plaintiff's* deposition until November 5, 1998, is of no consequence, as there is no requirement that a plaintiff must be deposed prior to the depositions of her accused harasser or the other witnesses in a given case. Poovey was

known to be a material witness (and to have retired from Defendant's employ) well in advance of November 1998, and his deposition could have, and should have, been arranged by Plaintiff's counsel prior to that time.

incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997), *citing Jenkins v. Home Ins. Co.,* 635 F.2d 310, 312 (4th Cir.1980) (*per curiam* ).

■ Under the "continuing violation" doctrine, an EEOC charge is timely filed as covering a series of alleged offensive acts so long as there is a "present violation" within the required time period, that is, an act of discrimination occurring within the 180 days preceding the filing. *Hill v. AT & T Technologies, Inc.,* 731 F.2d 175, 180 (4th Cir.1984). *See also Woodard v. Lehman,* 717 F.2d 909, 915 (4th Cir. 1983) (continuing violation theory available "only where an actual violation has occurred within that requisite time period"). A court applying the "continuing violation" theory should analyze:

> (1) whether the alleged acts involve the same type of discrimination; (2) whether the alleged acts are frequent; and (3) whether the alleged acts have a degree of permanence which would trigger an employee's awareness and duty to assert his or her rights.

*Bolt v. Norfolk Southern Corp.,* 22 F.Supp.2d 512, 516 (E.D.Va.1997), *citing Williams v. Enterprise Leasing Co. of Norfolk/Richmond,* 911 F.Supp. 988, 996 (E.D.Va.1995). The third listed factor essentially requires that Plaintiff show that she was either was not able to perceive the discriminatory animus behind the conduct, or was not aware that she had an avenue to pursue a grievance for said conduct, until sometime within the 180 days immediately preceding the filing of her charge with the EEOC. *See Bolt,* 22 F.Supp.2d. at 517 (summary judgment for defendants as to claims filed outside statutory time period because plaintiff testified that he knew he was being harassed and reported it to his supervisors seven years prior to filing

EEOC charge); *Williams,* 911 F.Supp. at 996–97 ("where a plaintiff claims that allegedly discriminatory events outside of the relevant Title VII statutory period are part of a 'continuing violation,' plaintiff must at the very least show that he or she failed to perceive the alleged discriminatory animus causing the claimed injury prior to the statutory period, and that such recognition would not reasonably have occurred until a point in time within the statutory period").

■ In the case at bar, Plaintiff filed her charge with the EEOC on September 24, 1996, meaning that she must prove that some sexual harassment or discriminatory conduct of the same type as generally alleged occurred after March 28, 1996, *and* that prior to filing her charge she was not sufficiently aware of the discriminatory conduct as to be on notice of her right to seek redress. Plaintiff alleges two general types of discriminatory conduct—both sexual harassment and disparate treatment. Specifically, regarding the first claim, the record is clear that Plaintiff perceived Poovey's physical contact and comments as offensive, at the latest, on August 25, 1995, the date her lawyer called City Manager Beasley to request that something be done about Poovey's conduct.[4] Accordingly, since Plaintiff did not file an EEOC charge within 180 days of August 25, 1995, the Court lacks subject matter jurisdiction to review any conduct by Poovey from prior to that date.[5] On these facts, the "continuing violation" doctrine simply is not applicable to Plaintiff's hostile work environment claim as to this alleged 1993 through 1995 conduct, and only Poovey's conduct after March 28, 1996 may be considered in determining the merits of that claim.

Regarding the second claim, Plaintiff alleges that either because of her gender or in retaliation for her earlier complaints

---

**4.** Moreover, at her lawyer's instruction, Plaintiff shortly thereafter began keeping a journal of her interactions with Poovey and his allegedly offensive conduct.

**5.** The substantive evidence regarding Chief Poovey's alleged conduct prior to that date is sorely lacking, and would be insufficient to raise a general issue of material fact as to his conduct prior to January 1996, in any event.

about Chief Poovey's conduct, she was 1) "demoted" from Fire Prevention Officer to receptionist; 2) denied an open position (on two separate occasions) with the City as a paid firefighter; and 3) denied training or assistance with training (specifically on how to drive the fire truck) that would have enabled her to qualify for a paid position. The record reflects that a significant portion, if not all, of this alleged conduct—including Plaintiff's being rejected for two open fire inspector positions—took place in the 180 days immediately preceding the filing of the EEOC charge or, indeed, even after the charge was filed. To the extent Plaintiff relies on events which occurred prior to March 28, 1996 (such as Defendant's alleged failure to train her properly) in support of these claims, the Court may, and will, consider evidence thereof in order to place the challenged employment decisions in their proper context.

### D. *Liability of the City of Conover*

Finally, before proceeding to the merits of Plaintiff's claims, the Court must address Defendant's argument that it cannot be liable to Plaintiff under Title VII because Plaintiff was never an employee of the City of Conover. Although Defendant's contention is not without some support in the case law and the record before the Court (namely the facts that Plaintiff was employed directly by the legally separate CVFD, that Plaintiff was paid or reimbursed for her services only by the CVFD, and that the City never paid payroll or Social Security taxes on the monies paid to the CVFD and ultimately to Plaintiff), there is substantial evidence to the contrary as well. Specifically, the Fire Chief, a City employee, served as both the administrative head and day-to-day supervisor of the CVFD volunteers; all the facilities and equipment used by the CVFD were provided by the City; and the City paid for advanced training for the volunteers.

Defendant refuses to concede that the City is the proper target of Plaintiff's failure to hire and retaliation claims, irrespective of whether these claims are meritorious. However, whether or not Plaintiff was ever a City employee, she clearly did apply to become an employee on two separate occasions. Therefore, had her rejections been for discriminatory or retaliatory reasons, as Plaintiff alleges, the City would bear responsibility.

Fortunately, however, this issue need not be resolved because, whether or not employer liability exists, Plaintiff has failed to come forward with sufficient evidence of discrimination to withstand Defendant's motion for summary judgment.

### E. *Plaintiff's Hostile Work Environment Claim*

Title VII of the Civil Rights Act of 1964, § 42 U.S.C. § 2000e *et seq.* makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Because the workplace environment is one of the "terms, conditions, or privileges of employment," Title VII has been held to create a cause of action in favor of persons forced to work in a "hostile work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (establishing "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment").

■ To establish a hostile work environment claim under Title VII, a plaintiff must prove the following elements:

> (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

*Spicer v. Commonwealth of Virginia, Dep't of Corrections,* 66 F.3d 705, 709–10 (4th Cir.1995), *citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), *and Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir. 1987).

■ The only evidence of a hostile work environment properly before the Court is Plaintiff's diary, excerpts of which were attached to her response to Defendant's summary judgment motion. The portions of these materials which refer to Chief Poovey's conduct after March 1996 simply describe him, on only a few occasions, as being "clingy" or repeatedly "hugging" Plaintiff and asking "How's my conduct?" (or words to that effect). This conduct is simply not sufficiently "severe and pervasive" to give rise to a hostile work environment claim. "[S]imple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"

*Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998), *citing Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). *See also McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1196 (4th Cir.) (refusing to recognize a Title VII claim for sexual harassment based solely on the alleged harasser's "vulgarity and insensitivity and meanness of spirit"), *cert. denied,* 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *Baskerville v. Culligan International Company,* 50 F.3d 428, 431 (7th Cir.1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage").

Plaintiff has adduced no admissible evidence of any sexually suggestive remarks, advances, or more intimate touching, the likes of which is usually required to sustain this type of action. *See, e.g., Katz v. Dole,* 709 F.2d 251, 253 (4th Cir.1983) (hostile environment found where "workplace was pervaded with sexual slurs, insults and innuendo, and [plaintiff] was personally the object of verbal sexual harassment by her fellow controllers ... [in] the form of extremely vulgar and offensive sexually related epithets addressed to and employed about [plaintiff] by supervisory personnel as well as by other controllers"); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515 (9th Cir.1989) (alleged harasser "repeatedly engaged in vulgarities, made sexual remarks, and requested sexual favors from [plaintiffs], [and their] ... direct supervisor ... frequently witnessed, laughed at, and herself made these types of comments"); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1015 (8th Cir.1988) (describing numerous sexual comments, epithets, unwelcome intimate physical contact, and solicitations for sexual favors).

■ Moreover, regarding the fourth element—that the Plaintiff must establish a basis for employer liability—the Fourth Circuit has "repeatedly held that an employer cannot be held liable for isolated remarks of its employees unless the employer 'knew or should have known of the harassment, and took no effectual action to correct the situation.'" *Spicer,* 66 F.3d at 710, *citing Katz,* 709 F.2d at 256. This well-accepted principle of Title VII law was not materially changed by the Supreme Court's recent opinions in *Faragher, supra,* or *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).[6]

6. In *Faragher* and *Ellerth,* the Supreme Court established the following standard for an employer's liability for a supervisor's acts of sexual harassment:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence ... (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective op-

The record before the Court clearly establishes that Plaintiff complained about Chief Poovey's conduct in August 1995, following which the City—whether required to or not—took immediate remedial action. The record contains no evidence whatsoever that Plaintiff complained again to City officials until after they received notice of her EEOC charge in September 1996, just before Poovey retired. Therefore, the City was not on notice of any further allegedly harassing conduct by Chief Poovey during the relevant time period, and cannot be held responsible for any alleged conduct that was not reported to it in some form or fashion.[7] *See, e.g., Swentek,* 830 F.2d at 558 (affirming judgment for employer in part because employer, once notified about plaintiff's charges, warned alleged harasser and received no further complaints from plaintiff thereafter). Similarly, the conduct described above is not so severe or pervasive that the City "should have known" about it, either. Accordingly, the Court will enter summary judgment in favor of Defendant on this claim.

### F.  *Plaintiff's Disparate Treatment Claim*

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established an allocation of the burden of production and an order for the presentation of proof in Title VII disparate treatment cases. The plaintiff in such a case must first establish, by a preponderance of the evidence, a *prima facie* case of gender discrimination. In the context of a challenged hiring decision, to prove a *prima facie* case, "[t]he plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under *McDonnell Douglas* and *Burdine,* once the plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory" reason for the challenged employment action. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer carries this burden of production, the presumption of discrimination "drops out of the picture," and the plaintiff "bears the ultimate burden of proving *both* that the employer's asserted reason was pretextual and that the plaintiff's [gender] . . . was the true reason for the adverse employment action." *Id.* at 510–11, 515–16, 113 S.Ct. 2742 (emphasis added). "[A]lthough the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Id.* at 506–07, 113 S.Ct. 2742, *citing Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

In the case at bar, specifically as to Plaintiff's failure to hire claims, Plaintiff's lack of qualification for a permanent fire engineer position itself is sufficient to defeat her *prima facie* case. *Cf. Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995) (plaintiff "must . . . eliminate concerns that she was [not hired] because of performance or qualifications . . ."). It is undis-

---

portunities provided by the employer or to avoid harm otherwise.

*Faragher,* 118 S.Ct. at 2292–93; *Ellerth,* 118 S.Ct. at 2270. Because the Court finds that Plaintiff has not met her burden of proof to establish that any actionable sexual harassment occurred during the relevant time period, the Court need not apply the *Faragher/El-*

*lerth* test to determine the City's liability for former Chief Poovey's actions.

7. Plaintiff's claim that the City should be held liable for Poovey's conduct is made even more tenuous by the ambiguous (at best) nature of the "employment" relationship between Plaintiff and the City, as discussed above.

puted that as of the December 1996 opening for a City firefighter position, Plaintiff did not meet the posted job requirements; specifically, she had not passed the requisite Emergency Vehicle Driving test. As of her second application—this time for a Level II Fire Inspector position—Plaintiff's deficiency was her lack of Level II certification.

To counter these disqualifying factors regarding each of her applications, Plaintiff alleges that she (and she alone, due to her gender) was not given adequate training or preparation for the emergency driving test, that she was forced to take the test on a "straight drive" instead of a fire truck with an automatic transmission, and that the minimum criteria for the second job opening were altered specifically in order to keep her from qualifying. However, these allegations find no factual support whatsoever in the record, save Plaintiff's own conjecture and speculation.[8] In fact, the record demonstrates that ample training was made available to Plaintiff—at City expense, no less—and Plaintiff has proffered no evidence that somehow emergency vehicle operation training was singularly withheld. Mere speculation and conjecture are wholly inadequate to support a claim of intentional discrimination. *See, e.g., Lovelace v. Sherwin–Williams,* 681 F.2d 230, 241–42 (4th Cir.1982); *Goldberg v. B. Green and Company,* 836 F.2d 845 (4th Cir.1988) (speculative assertions that Defendants' state of mind and motive are in dispute are not enough to withstand summary judgment).

Not only does Plaintiff fail to establish a *prima facie* case of gender discrimination, but she would, in any event, be unable to make the requisite showing that the legitimate reasons Defendant has offered for each of the challenged employment actions were both false and designed to serve as a pretext for gender bias. To the contrary, Plaintiff again relies solely on bare allegations of gender bias, and can point to no

direct or circumstantial evidence in the record of an intent by the City or any of its agents to discriminate against her on the basis of her gender.

### G. *Plaintiff's Retaliation Claim*

Finally, Plaintiff claims that the City discriminated against her in retaliation for her internal and formal complaints regarding Chief Poovey's alleged unwelcome conduct. Specifically, the Plaintiff alleges that the City refused to hire her for two open fire engineer positions, denied her necessary training to be qualified for those positions, and manipulated the application criteria to keep her from qualifying.

Plaintiff's retaliation claim is also analyzed under the *McDonnell Douglas* framework. "To prove a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the employer took adverse action against her, and (3) there was a causal connection between the activity and the adverse action." *Tinsley v. First Union National Bank,* 155 F.3d 435, 442 (4th Cir.1998), *citing Karpel v. Inova Health Sys. Servs.,* 134 F.3d 1222, 1228 (4th Cir.1998).

Once the Plaintiff has made the required *prima facie* showing, the burden shifts to the employer to produce a "legitimate non-discriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), *citing Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980). Finally, if the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual." *Id.,citing Womack,* 619 F.2d at 1296.

Once again, on the record before the Court, even assuming a *prima facie* case,

---

**8.** Indeed, the record indicates that following Plaintiff's second failure of the emergency vehicle driving test, whether in jest or in desperation, Plaintiff began asking male members of the CVFD if they could somehow take the test for her.

Plaintiff cannot carry her ultimate burden. For the previously stated reasons, evidence of the required "causal connection" between Plaintiff's internal complaint regarding Chief Poovey and/or her filing of an official charge with the EEOC, and the City's failure to hire her, is completely lacking.[9]

Even assuming *arguendo* that Plaintiff had established a *prima facie* case of retaliation, the City has provided legitimate, non-discriminatory reasons for rejecting Plaintiff's applications for permanent paid firefighter positions. Simply out, in December 1996, the Plaintiff was not qualified because she had not passed the Emergency Vehicle Driving certification, and in the summer of 1997, she did not meet the requirements for the Fire Inspector II position because she did not have Level II certification. In each instance, Defendant hired a more qualified individual who met the certification or driving requirements.

Plaintiff has come forward with no evidence whatsoever—other than her own bare suspicions and allegations—to establish that these reasons were false and that they were in fact a pretext for retaliation. Indeed, Chief Poovey had retired by the time each of these positions was filled, and had no input into either decision. Plaintiff has made no showing that incoming Chief Hall—or any other City decision-maker—was in any way motivated to discriminate against Plaintiff because of her prior complaints. Moreover, City Manager Beasley responded promptly and meaningfully to Plaintiff's initial complaint in August 1995, even though he was probably not legally obligated to do so, and Plaintiff did not complain again to City officials about Chief Poovey's behavior for a full year thereafter. This evidence cuts strongly against Plaintiff's claims of retaliatory motive.

Nor has Plaintiff adduced any evidence to support her contention that she was denied the necessary training to complete the emergency driving test or attain Level II inspector status. The evidence shows much to the contrary—namely, that the City attempted to pay for and provide advanced training to Plaintiff as to all the other volunteers. Plaintiff's sole deficiency was her inability to pass the emergency vehicle driving requirements, a fact that appears to stem more from her admittedly diminutive size and lack of experience than from any neglect, inattention, or misconduct by her supervisors or fellow volunteers.

### III. *ORDER*

NOW THEREFORE, IT IS ORDERED:

1. "Plaintiff's Rule 56(f) Motion" (document # 24) and "Request for Hearing on Plaintiff's Opposition to Defendant's Motion for Summary Judgment" (document # 26) are **DENIED;**

2. Defendant's Motion For Summary Judgment (document # 8) is **GRANTED,** and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**

3. The Clerk is directed to send copies of this Memorandum and Order, and a copy of the Judgment to be filed simultaneously herewith, to counsel for the parties.

**SO ORDERED.**

---

9. The Court finds no merit in Plaintiff's claim that she was "demoted" to a receptionist. Whatever position she had with the CVFD, it always involved clerical duties or answering phones, was conducted for minimal hourly pay, and permitted her to work as much or as little as she liked and from whatever location she liked. There is no evidence that the terms and conditions of this "employment"—if indeed it can be classified as such—were materially altered in any meaningful way.